**MCGAUGHEY ERICKSON**
Robert J. McGaughey, OSB #800787
bob@law7555.com
Aurelia Erickson, OSB #126170
aurelia@law7555.com
1500 SW 1st Ave., Ste. 800
Portland, OR 97201
Tel. (503) 223-7555

*Lead Counsel for Plaintiffs*

[Additional counsel listed on signature page.]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| ELIA AZAR and DEAN ALFRANGE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BLOUNT INTERNATIONAL, INC., JOSHUA L. COLLINS, DAVID A. WILLMOTT, ROBERT E. BEASLEY, JR., RONALD CAMI, ANDREW C. CLARKE, NELDA J. CONNORS, E. DANIEL JAMES, HAROLD E. LAYMAN, MAX L. LUKENS, DANIEL J. OBRINGER, AMERICAN SECURITIES, LLC, P2 CAPITAL PARTNERS LLC, ASP BLADE INTERMEDIATE HOLDINGS, INC., and ASP BLADE MERGER SUB, INC.,<br><br>Defendants. | Case No. 16-483<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br>**(1) Violation of § 14(a) of the Securities Exchange Act of 1934 (17 U.S.C. § 78n(a))**<br>**(2) Violation of § 20(a) of the Securities Exchange Act of 1934 (17 U.S.C. § 78t(a))**<br>**(3) Aiding and Abetting**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Elia Azar and Dean Alfrange ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, allege the following against the above-listed defendants (collectively, "Defendants") upon information and belief, including the

investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiffs, which are alleged upon personal knowledge:

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiffs on behalf of themselves and all other similarly situated public stockholders of Blount International, Inc. ("Blount" or the "Company"): **(1)** against Blount for violating Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 17 U.S.C. § 78n; **(2)** against Blount's board of directors (the "Board" for violating Section 20(a) of the Exchange Act, 17 U.S.C. § 78t(a), for material misrepresentations and omissions in the Schedule 14A Proxy Statement that Blount filed with the U.S. Securities and Exchange Commission (the "SEC") on March 9, 2016 (the "Proxy Statement"); and **(3)** against American Securities LLC ("American Securities"), P2 Capital Partners LLC ("P2"), ASP Blade Intermediate Holdings, Inc. ("Merger Parent") and ASP Blade Merger Sub, Inc. ("Merger Sub," and collectively, the "Buyout Group") for aiding and abetting such violations.

2.      Blount is a Portland-based global manufacturer and marketer of replacement parts, equipment, and accessories for consumers and professionals in the forestry, lawn and garden, farm, ranch, agriculture, and construction industries.

3.      P2 is one of Blount's largest stockholders, owning roughly 15% of the Company's stock and exerting considerable influence over Blount's management and Board. Recognizing the Company's extraordinary upside, P2 approached defendant Joshua L. Collins ("Collins"), Blount's Chairman and Chief Executive Officer ("CEO"), in early 2015 about partnering with another investor to take the Company private. For the rest of the year, P2, which eventually teamed with American Securities LLC ("American Securities"), worked with defendants Collins and David A.

Willmott ("Willmott"), another Blount executive who served on the Board, to cement a deal to sell the Company.

4.    On December 10, 2015, following months of negotiations led by Collins and Willmott with minimal Board involvement, Blount announced that it had entered into an Agreement and Plan of Merger, dated December 9, 2015 (the "Merger Agreement"), under which P2 and American Securities, through affiliates Merger Parent and Merger Sub, will acquire all of the outstanding shares of Blount common stock for $10 per share, or a total of approximately $855 million (the "Buyout").

5.    While Blount stockholders are being cashed out at an inopportune time—the Company's business is cyclical and the Buyout is timed to take advantage of this—P2, American Securities, Collins, and Willmott will reap the benefits of the Company's upside.

6.    The Buyout resulted is contingent upon, among other things, approval by a majority of shares of Blount's outstanding common stock.

7.    On March 9, 2016, Blount filed the Proxy Statement with the SEC, which announced that the stockholder vote on the Buyout will occur on April 7, 2016 at 10:00 a.m. E.D.T.

8.    In violation of the federal securities laws, the Proxy Statement misrepresents and omits material information concerning the Buyout, information which Blount stockholders are legally entitled to receive in order to cast a sufficiently informed vote on the Buyout.

9.    In particular, the Proxy Statement discloses some high-level information regarding Blount's November 2015 financial projections and December 2015 financial projections for calendar years 2015E through 2020E. However, the Proxy Statement altogether fails to disclose any information whatsoever about the Company's financial projections as they existed earlier in the process leading up to the Buyout. Specifically, the Proxy Statement alludes to financial

projections that management created at least as early as September 2015. And although the Company posted sequential quarter-to-quarter gains during this period, defendants Collins and Willmott decided to reduce Blount's projections in order to justify a deal at a fire sale price. Blount stockholders must be given the earlier set(s) of financial projections in order to gain an accurate view of the Company's prospects, and the failure to disclose such information renders the Proxy Statement materially misleading and inadequate.

10.     Blount stockholders will be irreparably harm because the Proxy Statement's material misrepresentations and omissions prevent them from casting a sufficiently informed vote on the Buyout at the April 7, 2016 special meeting. Accordingly, Plaintiffs here seek injunctive relief to prevent such irreparable harm.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the claims for violations of §§ 14(a) and 20(a) of the Exchange Act pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa.  Federal courts have "exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by" the Exchange Act.  In addition, this Court has jurisdiction over the claims for violations of §§14(a) and 20(a) of the Exchange Act, pursuant to 28 U.S.C. §1331, because the claims arise under the laws of the United States.

12.     This Court has personal jurisdiction over Defendants because they conduct business in Oregon, including, but not limited to, the conduct here at issue, the unfair Buyout, and because they have sufficient minimum contacts with Oregon to render the exercise of jurisdiction by Oregon courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant § 27 of the Exchange Act because acts or transactions constituting the violations of the Exchange Act took place in this District and

---

defendants transacted business in this District.  Venue in this Court is also proper pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this Complaint took place in this District. Further, defendants have purposely availed themselves of the benefits of this Court and this District by appearing and litigating in a related action.

## THE PARTIES

14.    Plaintiffs are, and have been at all relevant times, stockholders of Blount.

15.    Defendant Blount (NYSE:BLT) is a Delaware corporation and leading global manufacturer and marketer of replacement parts, equipment, and accessories for the forestry, lawn, and garden; farm, ranch, and agriculture; and concrete cutting and finishing markets. The Company maintains its principal executive offices at 4909 SE International Way, Portland, Oregon 97222-4679.

16.    Defendant Collins has served as a member of the Board since January 2005, as Blount's Chairman since May 2010, and as the Company's CEO since December 2009. Collins also acted as President, Chief Operating Officer & CEO Designate as of October 19, 2009. Collins has a long history and relationship with the financial industry. He worked for Lehman Brothers Inc. or affiliates thereof from 1996 until the bank's collapse in 2008. Thereafter, alongside co-defendant Willmott, he formed Collins Willmott & Co. LLC, a private equity firm located in New York City. Collins is expected to stay with the Company following the Buyout and has also agreed to rollover a significant portion of his current Blount equity holdings into the post-close entity. Specifically, Collins has agreed to contribute 51,253 shares of Company common stock (worth $512,530 based on the $10.00 per share Buyout consideration) and $633,390 as an additional subscription (equal to 50% of the value of Collins's equity-based stock awards). If Collins receives any additional shares of Blount common stock in the form of RSUs, he will also

rollover a portion of those. Separately, Collins will receive a grant of options to purchase up to 6% of the fully diluted common shares of the post-close entity, subject to vesting requirements. Collins is also interested because he stands to receive $4,591,650 in change-of-control payments (in the event he is terminated post-close) as well as $1,266,780 in respect of vested stock options and vested and unvested RSUs. Collins is also expected to serve on the board of directors of the post-close entity. In its most recent annual proxy statement, Blount admitted that defendant Collins is not independent.

17.     Defendant Willmott has served as Blount's President and Chief Operating Officer since March 2011 and as a member of the Board since March 2012. Willmott previously served as the Company's Senior Vice President—Corporate Development & Strategy. Willmott has a long history and relationship with the financial industry. He worked for Lehman Brothers Inc. or affiliates thereof from 1997 until the bank's collapse in 2008. Thereafter, alongside co-defendant Collins, he formed Collins Willmott & Co. LLC, a private equity firm located in New York City. Willmott is expected to stay with the Company following the Buyout and has also agreed to rollover a significant portion of his current Blount equity holdings into the post-close entity. Specifically, Willmott has agreed to contribute 39,363 shares of Company common stock (worth $393,630 based on the $10.00 per share Buyout consideration) and $299,585 as an additional subscription (equal to 50% of the value of Collins's equity-based stock awards). If Willmott receives any additional shares of Blount common stock in the form of RSUs, he will also rollover a portion of those. Separately, Willmott will receive a grant of options to purchase up to 6% of the fully diluted common shares of the post-close entity, subject to vesting requirements. Willmott is also expected to serve on the board of directors of the post-close entity. Willmott is also interested because he stands to receive $2,896,416 in change-of-control payments (in the event

he is terminated post-close) as well as $599,170 in respect of vested stock options and vested and unvested RSUs. In its most recent annual proxy statement, Blount admitted that defendant Willmott is not independent.

18.    Defendant Robert E. Beasley, Jr. ("Beasley") has been a member of the Board since January 1, 2010 and its Lead Director since December 7, 2011. Beasley is also the Chairman of the Compensation Committee and a member of the Audit Committee. Apart from Blount, since 1991 Beasley has also served as an executive or director of Hunter Fan Company, where defendant Willmott also served as chairman of the board.

19.    Defendant Ronald Cami ("Cami") has been a member of the Board since December 2010. Cami is also a member of the Nominating and Corporate Governance Committee.

20.    Defendant Andrew C. Clarke ("Clarke") has been a member of the Board since May 27, 2010. Clarke is also the Chairman of the Audit Committee and a member of the Compensation Committee.

21.    Nelda J. Connors ("Connors") has been a member of the Board since March 26, 2012. Connors is also a member of the Audit Committee.

22.    Defendant E. Daniel James ("James") has been a member of the Board since August 1999. James is also a member of the Compensation Committee. Apart from Blount, James worked for Lehman Brothers, Inc. or affiliates thereof until its demise in 2008. Since then, James has worked for Trilantic North America, a private equity investment firm and successor to Lehman Brothers Merchant Banking. James has also served on other boards of directors with Collins, including Phoenix Brands LLC.

23.    Defendant Harold E. Layman ("Layman") has been a member of the Board since 1999 and was previously the Company's President from February 2000 to August 16, 2002, Chief

Executive Officer from March 2001 to August 16, 2002, and Chief Operating Officer from February 2000 to 2001. Layman is also the Chairman of the Nominating and Corporate Governance Committee.

24.     Daniel J. Obringer ("Obringer") has been a member of the Board since April 25, 2014. Obringer is also a member of the Nominating and Corporate Governance Committee.

25.     Defendant Max L. Lukens ("Lukens") has been a member of the Board since July 31, 2015. Lukens is also a director of Westlake Chemical Corporation, a public company and international manufacturer and supplier of petrochemicals and building products that has a longstanding relationship with Goldman Sachs & Co. ("Goldman Sachs"), which served as the Board's financial advisor in connection with the Buyout.

26.     Defendants in paragraphs 16-25 are herein referred to as the "Individual Defendants" and, together with Blount, the "Blount Defendants."

27.     Defendant American Securities is a United States private equity firm that invests in market-leading North American companies with annual revenues generally ranging from $200 million to $2 billion and/or $50 million to $200 million of EBITDA. The company maintains its principal executive offices at 299 Park Avenue, New York, New York 10017.

28.     Defendant P2 is a privately owned hedge fund sponsor and current shareholder of Blount. The company maintains its principal executive offices at 590 Madison Avenue, New York, New York, 10022.

29.     Defendant Merger Parent is a Delaware corporation and wholly-owned subsidiary of American Securities LLC created for the purpose of effectuating the Buyout.

30.     Defendant Merger Sub is a Delaware corporation and wholly-owned subsidiary of American Securities LLC created for the purpose of effectuating the Buyout.

31.     Defendants American Securities, P2, Merger Parent, and Merger Sub are collectively referred to as the Buyout Group.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and on behalf of all persons who held Blount common stock at the close of business on March 4, 2016, the record date for the special meeting to vote on the Buyout, excluding Defendants and their affiliates. This action is properly maintainable as a class action for the following reasons.

33.     The Class is so numerous that joinder of all members is impracticable. As of the close of business of March 4, 2016, there were 48,250,363 shares of Blount common stock issued and outstanding, held by 1,403 stockholders of record. The actual number of public stockholders of Blount, including those who own Blount stock in street name, can be ascertained through discovery.

34.     There are questions of law and fact which are common to the Class, including:

(a)     Whether the Proxy Statement misrepresents or omits material information in violation of Section 14(a) of the Exchange Action, 17 U.S.C. §78n(a);

(b)     Whether the Board members are liable as control persons under Section 20(a) of the Exchange Act, 17 U.S.C. § 78t(a);

(c)     Whether the Buyout Group constituents are liable as control persons under Section 20(a) of the Exchange Act, 17 U.S.C. § 78t(a);

(d)     Whether defendants Collins, Willmott, or the Buyout Group aided and abetted any of the foregoing violations of the Exchange Act; and

(e)    Whether the Class is entitled to any relief as a result of Defendants

violations of the federal securities laws.

35.    Plaintiffs' claims are typical of the claims of the other members of the Class, and

Plaintiffs are not subject to any atypical defenses.

36.    Plaintiffs are adequate representatives of the Class, have no interests adverse to the

Class, have retained competent counsel experienced in litigation of this nature, and will fairly and

adequately protect the interests of the Class.

37.    This action is maintainable under Rule 23(b)(1) and (2) of the Federal Rules of

Civil Procedure. The prosecution of separate actions by individual members of the Class would

create the risk of inconsistent or varying adjudications that would establish incompatible standards

of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the

interests of individual members of the Class who are not parties to the adjudications or would

substantially impair or impede those non-party Class members' ability to protect their interests.

Alternatively, Defendants have acted on grounds generally applicable to the Class with respect to

the matters complained of herein, thereby making appropriate the relief sought herein with respect

to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### *Blount's History, Current Business, and Financial Prospects*

38.    Founded in 1947 in Portland, Oregon, Blount manufactures, and markets

equipment, replacement and component parts, and accessories for professionals and consumers.

The Company operates in two business segments: Forestry, Lawn, and Garden ("FLAG") segment,

and Farm, Ranch, and Agriculture ("FRAG") segment. The FLAG segment manufactures and

markets cutting chain, guide bars and drive sprockets for chain saw use, and lawnmower and other

cutting blades for outdoor power equipment. The FLAG segment also purchases replacement parts and accessories from other manufacturers and markets them, under Blount's brands. The FRAG segment designs, manufactures, assembles and markets attachments and implements for tractors in mowing, cutting, clearing, material handling, landscaping and grounds maintenance applications, as well as log splitters, post-hole diggers, self-propelled lawnmowers, attachments for off-highway construction equipment applications, and other general purpose tractor attachments.

### _Overview of the Buyout and Blount's Filing of the Proxy Statement_

39.    P2 Capital Partners indicated an interest in acquiring the Company – and retaining the Company's management post-transaction – as early as January 2014.  P2 later teamed up with American Securities to form the Buyout Group in furtherance of its quest to acquire Blount.

40.    On August 6, 2015, the Buyout Group submitted an informal indicative proposal to acquire Blount at a price range of $11.00 to $12.50 per share.  The Buyout Group also indicated it intended to retain Defendant Collins and David Willmott ("Willmott"), Blount's President and Chief Operating Officer, after the close of the transaction.

41.    At a meeting of the Board that followed, the Board concluded that, while it had made no decision with respect to a potential sale of the Company, it was in the best interest of shareholders to evaluate a potential strategic transaction with the Buyout Group. From there on out, P2 worked with conflicted defendants Collins and Willmott to cement a deal to sell the Company to P2.

42.    On September 2, 2015, the conflicted Defendant Collins met with a representative of Party C to discuss that party's interest in a potential acquisition of the Company.  Defendant

Collins informed Party C that he believed the Board would demand a substantial premium to consider an acquisition of Blount.

43.    On October 15, 2015, at a meeting of the Board, Goldman, which was serving as the Company's financial advisor, informed the Board that the financial projections Goldman had used in its preliminary analysis were no longer current and rather, underestimated the Company's prospects.  The Board then determined that management should prepare updated financial projections for the Company. It is unclear whether the revised, more optimistic projections, were ever given to Party C.

44.    Thereafter, on November 17, 2015, the Special Committee – established for the express purpose of insulating the conflicts of interest of Defendant Collins and Willmott – approved a request by the Buyout Group to meet with Defendant Collins and Willmott and discuss the terms of their post-transaction employment.  Accordingly, the Company's management was negotiating the terms of their post-transaction employment before the Merger Agreement was even executed, before the expiration of the now merely perfunctory go-shop, and while Party C remained interested in a potential acquisition.

45.    What happened next in the already substantively exclusive and irremediably conflicted sales process reduced the process to a fire sale.  On December 4, 2015, the Buyout Group informed the Company it was reducing its offer for the Company to only $9.85 per share after the Buyout Group had failed to secure financing of the transaction at $10.80 per share for several weeks.

46.    In response, the Special Committee, which had previously requested an offer of at least $11.00 per share less than two months prior, countered the Buyout Group's reduced offer with a request for $10.30 per share.  On December 7, 2015, two days later, the Buyout Group

offered a final and best offer of only $10.00 per share, down substantially from the $10.80 per share previously negotiated.

47.    The following day, the Special Committee quickly accepted without contacting Party C who was still conducting due diligence and recommended the Proposed Transaction to the Board.

48.    The Board accepted and approved the Proposed Transaction on December 9, 2015, one day later, and executed the Merger Agreement the same day

49.    On December 10, 2015, the Company issued a press release publicly announcing the Buyout, stating:

> PORTLAND, Ore. and NEW YORK, Dec. 10, 2015 (GLOBE NEWSWIRE) -- Blount International, Inc. (NYSE:BLT) ("Blount" or the "Company") today announced that it has entered into a definitive agreement to be acquired by affiliates of American Securities LLC ("American Securities") and P2 Capital Partners, LLC ("P2 Capital Partners") in an all-cash transaction valued at approximately $855 million, including the assumption of debt. Blount is a global manufacturer and marketer of replacement parts, equipment, and accessories for consumers and professionals operating in three market segments: Forestry, Lawn, and Garden ("FLAG"); Farm, Ranch, and Agriculture ("FRAG"); and Concrete Cutting and Finishing ("CCF").
>
> Under the terms of the proposed transaction, Blount shareholders will receive $10.00 in cash for each share of Blount common stock they hold. This represents a premium of 86% to the Company's closing stock price on December 9, 2015, the last trading day before the announcement of the proposed transaction. The independent members of Blount's Board of Directors unanimously approved the proposed transaction based upon the unanimous recommendation of a Special Committee, which was comprised of independent directors and advised by its own financial and legal advisors. The Special Committee and the independent members of the Board each recommended that the Company's shareholders adopt the merger agreement.
>
> The merger agreement includes a 50-day "go-shop" period which runs through January 28, 2016 and is designed to maximize value for Blount shareholders. During this period, the Special Committee, with the assistance of its and the Company's financial and legal advisors, will actively solicit alternative proposals to acquire Blount. There can be no assurances that this process will result in a superior proposal. Blount and the Special Committee do not intend to disclose

developments with respect to the solicitation process until the Special Committee and the Board have made a decision.

*        *        *

Blount expects to maintain its corporate headquarters in Portland, Oregon and its existing global distribution and sales footprints.

In addition to equity funds managed by American Securities and P2 Capital Partners, it is anticipated that Josh Collins, Chairman and Chief Executive Officer of Blount, and David Willmott, President and Chief Operating Officer of Blount, will invest all of their net proceeds from the transaction in Blount. Blount, American Securities and P2 Capital Partners have also secured committed debt financing from Barclays Bank and KeyBanc Capital Markets.

The proposed transaction is expected to close in the first half of 2016, subject to the approval by Blount's shareholders and regulatory authorities, the satisfaction or waiver of customary closing conditions and Blount's ability to terminate the merger agreement to accept a superior proposal.

P2 Capital Partners and certain of its affiliates, which collectively own approximately 14.9% of Blount's outstanding shares, have entered into an agreement with the Company to vote their shares in accordance with the recommendation of the Company's Board of Directors with respect to the proposed transaction. If the Company accepts a superior proposal, P2 Capital Partners has agreed to vote all of their shares in favor of an all-cash superior proposal and to vote their shares for or against other superior proposals in the same proportion as the Company's shareholders excluding American Securities, P2 Capital Partners, members of the Company's management or Board of Directors, or any of their respective affiliates.

The merger agreement provides that Blount will pay a termination fee of approximately $7.3 million if the merger agreement is terminated in connection with a superior proposal that arose during the "go-shop" period and a termination fee of approximately $14.7 million if the merger agreement is terminated in connection with a superior proposal that arose following the "go-shop" period.

50.    Defendants Collins and Willmott were actively involved in soliciting interested parties during the go-shop period despite their obvious conflicts of interest. Goldman was also tasked as co-lead financial advisor in connection with the go-shop process, despite Goldman's clear motivation to favor American Securities and to a lesser extent, P2 Capital Partners.

51.     On January 29, 2016, Blount announced that the go-shop period had concluded and that the Company would be proceeding with the Buyout.

52.     On March 9, 2016, Blount filed the Proxy Statement with the SEC, announcing that the special meeting at which Blount stockholders would be asked to vote on the Buyout would occur on April 7, 2016 at 10 a.m. E.D.T.

53.     As alleged specifically herein, the Proxy Statement misrepresents or omits material information concerning the Buyout, thus depriving Blount stockholders of their legal entitlement to receive any and all material information before having to cast a vote on the Buyout.

***The Proxy Statement Misrepresents and Omits Material Information Concerning Blount's Financial Projections***

54.     Throughout the process leading up to the announcement of the Buyout, Blount's management created sets of financial projections, which purportedly exhibited management's expectations regarding Blount's future financial performance.

55.     The Proxy Statement discloses a partial summary a set of projections created in November 2015 (the "November Projections") and of another set of projections created in December 2015 (the "December Projections") for calendar years 2015E through 2020E. Proxy at 60-61.

56.     The Proxy Statement fails to disclose, however, any information whatsoever about any previous sets of projections that the Company's management created.

57.     The Proxy Statement specifically references financial projections that management created at least as early as September 2015 (the "September Projections"):

> On October 15, 2015, an executive session of the independent members of the Board was held, with representatives of Cravath and Goldman Sachs attending by telephone. During this meeting, at the request of the independent members of the Board, representatives of Goldman Sachs reviewed Goldman Sachs' preliminary financial analysis of the October 12th proposal from the Buyer Parties. At this

meeting, representatives of Goldman Sachs also reported that the management of the Company had informed them that the financial projections used by Goldman Sachs in its previous preliminary financial analyses (including on September 9, 2015). . . .

58.     As noted above, these September Projections were used by Goldman Sachs in preliminary financial analyses that it performed and presented to the Board on September 9, 2015.[1]

59.     The Proxy Statement, while deliberately vague, indicates that management (including, notably, self-interested defendants Collins and Willmott) told a conflicted Goldman Sachs that the September Projections "were no longer current" and that management would be revising the September Projections downward.

60.     The roundabout manner by which this was conveyed to the Board is concerning. Specifically, instead of management directly conveying the purported outdatedness of the September Projections to the Board, at a October 15, 2015 Board meeting, "representatives of Goldman Sachs also reported that the management of the Company had informed them that the financial projections used by Goldman Sachs in its previous preliminary financial analyses (including on September 9, 2015) were no longer current . . . ."

61.     Instead of inquiring directly with Blount management, the Board relied upon Goldman Sachs' questionable hearsay and decided that management should prepare update financial projections.

62.     In other words, the Board deferred to two separate indisputably conflicted factions—Collins and Willmott, on the one hand, and Goldman Sachs, on the other—to cut the

---

[1]     The Proxy Statement does not explicitly state that management created any sets of financial projections in September 2015. However, Plaintiffs refer to the September Projections as such for ease of reference and because they were used in valuation analyses presented by Goldman Sachs on or about September 9, 2015.

Company's 5-year projections to whatever level Collins and Willmott deem suitable in their unchecked and unfettered discretion.

63.     Typically, multi-year projections like the ones partially disclosed here reflect at least some version of a company's purported long-range plan, and they encapsulate numerous assumptions, including those related to investment, research and development, capital expenditures, market conditions, currency fluctuations, financing needs and options, and various other microeconomic and macroeconomic considerations. Such long-range plans necessarily require director involvement because they reflect how a given business should be run. A board that is not involved in developing a company's long-range plan is not fulfilling its basic charge of affirmatively managing the company's affairs for the benefit of stockholders.

64.     The Company posted sequential quarter-to-quarter gains during this period, and it did not publicize any information that would warrant slashing its financial projections.

65.     On November 9, 2015, Blount reported operating income of $14.1 million for the third quarter (Q3) of 2015, compared to a $47.3 million loss in the second quarter (Q2) of 2015;  $29.8 million consolidated adjusted EBITDA in Q3 compared to $26.9 million in Q2; and a $12.3 million in Q3 compared to a $49.5 million net loss in Q2. The Company also announced that it had taken additional actions in Q3 to align production rates and spending with updated 2015 outlook.

66.     In fact, the Proxy Statement acknowledges that in October management told the Buyout Group that it "anticipated improved third quarter results and provided greater certainty that the Company would meet year-end targets as compared with the preliminary reports provided to the Buyer Parties prior to October 8, 2015."

CLASS ACTION ALLEGATION COMPLAINT                                    17

67.     These statements belie the notion that Blount needed to reduce its 5-year financial projections based on any objective measure of the Company's financial performance.

68.     Rather, defendants Collins and Willmott decided to reduce Blount's projections in order to justify a deal at a fire sale price. Indeed, Blount's financial projections provide the basis for the discounted cash flow ("DCF") analyses performed by both Goldman and Greenhill & Co., Inc. ("Greenhill").

69.     The DCF analysis is widely recognized as the most probative of a company's intrinsic value, and manipulating financial projections can yield highly misleading valuation ranges in a DCF analysis.

70.     Here, by reducing Blount's financial projections during the process, Collins and Willmott succeeded in creating inputs that would enable Goldman and Greenhill to render a fairness opinion on the materially inadequate $10 per share being offered in the Buyout.

71.     Blount stockholders must be given the earlier set(s) of financial projections in order to gain an accurate view of the Company's prospects, and the failure to disclose such information renders the Proxy Statement materially misleading and inadequate.

## CAUSES OF ACTION

### COUNT I
**Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against Blount and the Individual Defendants)**

72.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

74.    During the relevant period, Defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

75.    By virtue of their positions within the Company, the Blount Defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the Blount Defendants. The Proxy Statement misrepresented and/or omitted material facts, as detailed above.  The Blount Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.  The Defendants have also failed to correct the Proxy Statement, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

76.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Buyout.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

77.    By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

CLASS ACTION ALLEGATION COMPLAINT                                      19

78.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiffs and the members of the Class, to the irreparable harm of the members of the Class.

79.     Because of the false and misleading statements in the Proxy Statement, Plaintiffs and the Class are threatened with irreparable harm, rendering money damages inadequate.  Without this information, Plaintiffs and Blount stockholders will be prevented from intelligently and rationally deciding for themselves whether they approve of the merger or desire to seek appraisal. Therefore, injunctive relief is appropriate to ensure the Blount Defendants' misconduct is corrected.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against All Individual Defendants and the Buyout Group)

80.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.     Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

82.     By reason of the allegations herein, Defendants violated §14(a) of the Exchange Act by issuing and publishing the Proxy, which contained untrue statements of material fact concerning the Proposed Transaction, and omitted material facts concerning the Proposed Transaction necessary in order to make the statements in the Proxy not misleading.

83. The Individual Defendants were controlling persons of Blount within the meaning of §20(a) of the Exchange Act.

84. The Individual Defendants, by virtue of their positions as officers and/or directors of Blount, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of Blount.

85. The Individual Defendants, by virtue of their positions as officers and/or directors of Blount, had the power or ability to control the issuance, publication, and contents of the Proxy. The Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered concerning the Proposed Transaction.

86. The Individual Defendants, by virtue of their positions as officers and/or directors of Blount, had the ability to prevent the issuance of the materially misleading Proxy or to cause the Proxy to be corrected so that it was not in violation of §14(a) of the Exchange Act.

87. By virtue of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act, and Plaintiffs are entitled to relief.

**COUNT III**
**Aiding and Abetting**
**(Against Collins, Willmott, and the Buyout Group)**

88. Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

89. As alleged herein, the Blount Defendants violated the federal securities laws in connection with the dissemination of the Proxy Statement.

---

CLASS ACTION ALLEGATION COMPLAINT                                    21

90.     Collins, Willmott, and the Buyout Group knew of the material information that should have been, but was not, disclosed in the Proxy Statement giving rise to the Blount Defendants underlying liability for violating the federal securities laws.

91.     Collins, Willmott, and the Buyout Group had a conscious and specific motivation for either bringing about such securities violations or failing to prevent such securities violations before they occurred.

92.     Collins and Willmott, as members of the Board, had access to the Proxy Statement before it was filed with the SEC and disseminated to stockholders.

93.     Moreover, under Section 5.3 of the Merger Agreement, "the Company shall provide Parent with a reasonable opportunity to review and comment on [the Proxy Statement] or response and shall consider in good faith the comments proposed by Parent."

94.     Nonetheless, Collins, Willmott, and the Buyout Group all want stockholder approval of the Buyout and are specifically motivated to suppress material information that may weaken or undermine stockholder support for the Buyout.

95.     Collins, Willmott, and the Buyout Group did act, or fail to act, in a manner so as to aid and abet the Blount Defendants' violations of the federal securities laws.

96.     As a result of the conduct of Collins, Willmott, and the Buyout Group, Plaintiffs and all other Blount stockholders stand to suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand injunctive relief in their favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as Class representatives;

B.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Buyout, unless and until Defendants remedy their federal securities laws violations vis-à-vis the Proxy Statement;

C.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiffs and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiffs and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and LR 23, Plaintiffs demand a trial by jury of all issues so triable.

Dated:  March 21, 2016                      **MCGAUGHEY ERICKSON**

                                            By:_____s/  Robert J. McGaughey_____
                                                Robert J. McGaughey, OSB #800787
                                                bob@law7555.com
                                                Aurelia Erickson, OSB #126170
                                                aurelia@law7555.com
                                                1500 SW 1st Ave., Ste. 800
                                                Portland, OR 97201
                                                Tel. (503) 223-7555

                                                *Lead Counsel for Plaintiffs*

                                            **JOHNSON & WEAVER, LLP**
                                                W. Scott Holleman

ScottH@johnsonandweaver.com
99 Madison Avenue, 5th Floor
New York, NY 10016
Tel. (212) 802-1486

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins
shopkins@zlk.com
30 Broad Street, 24th Floor
New York, NY 10004
Tel. (212) 363-7500

*Associate Counsel for Plaintiffs*