**MCGAUGHEY ERICKSON**
Robert J. McGaughey, OSB #800787
bob@law7555.com
1500 SW 1st Ave., Ste. 800
Portland, OR 97201
Tel. (503) 223-7555

*Lead Counsel for Plaintiffs*

[Additional counsel listed on signature page.]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| ELIA AZAR and DEAN ALFANGE, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>    v.<br><br>BLOUNT INTERNATIONAL, INC., JOSHUA L. COLLINS, DAVID A. WILLMOTT, ROBERT E. BEASLEY, JR., RONALD CAMI, ANDREW C. CLARKE, NELDA J. CONNORS, E. DANIEL JAMES, HAROLD E. LAYMAN, MAX L. LUKENS, DANIEL J. OBRINGER, AMERICAN SECURITIES, LLC, P2 CAPITAL PARTNERS LLC, ASP BLADE INTERMEDIATE HOLDINGS, INC., and ASP BLADE MERGER SUB, INC.,<br><br>                    Defendants. | Case No. 3:16-CV-00483-SI<br><br><br>**Plaintiffs'**<br>**OPPOSITION TO BLOUNT**<br>**DEFENDANTS' MOTION**<br>**TO DISMISS**<br>**Plaintiffs' Amended Class Action**<br>**Allegation Complaint**<br><br><br>**Request for Oral Argument** |

## TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    I.      The Parties and Relevant Non-Parties ................................................... 3

    II.     Overview of the Facts Giving Rise to the Action .................................... 6

    III.    Procedural History ................................................................................ 11

ARGUMENT ............................................................................................................ 12

    I.      Applicable Standard of Adjudication................................................... 12

    II.     Plaintiffs Have Adequately Pled Claims Against the Blount Defendants for Violating Section 14(a) of the Exchange Act................................... 13

          A.     Pleading Requirements Under Section 14(a) and Rule 14a-9 ................. 13

          B.     The Proxy Statement Was Materially False and Misleading Because It Omitted the September Projections and Included the Manipulated November Projections and December Projections .............. 15

          C.     Plaintiffs Adequately Alleged That the Blount Defendants Acted with Negligence ..................................................................................... 21

          D.     Plaintiffs Have Adequately Alleged Loss Causation............................... 24

    III.    Plaintiffs Have Adequately Alleged Claims Against the Individual Defendants Under § 20(a) of the Exchange Act .................................... 26

CONCLUSION......................................................................................................... 26

## TABLE OF CASES AND AUTHORITIES

**Cases**

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
   650 A.2d 1270 (Del. 1994) ......................................................................... 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................... 12

*Assad v. Mines Mgmt.*,
   2016 U.S. Dist. LEXIS 119544 (E.D. Wash. Sept. 6, 2016) .................................. 19

*Beebe v. Pac. Realty Tr.*,
   99 F.R.D. 60 (D. Or. 1983) ........................................................................... 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................... 12, 13

*City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*,
   No. C 07-05111 CW, 2009 U.S. Dist. LEXIS 33339 (N.D. Cal. Apr. 6, 2009)...................... 22

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ......................................................................... 13

*Erickson v. Blake*,
   839 F. Supp. 2d 1132 (D. Or. 2012) ....................................................... 11, 12, 13

*In re DaimlerChrysler AG Sec. Litig.*,
   197 F. Supp. 2d 42 (D. Del. 2002).................................................................... 24

*In re Emerging Commc'ns, Inc. S'holder Litig.*,
   C.A. No. 16415, 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004)............................... 16

*In re Hot Topic, Inc. Securities. Litigation*,
   No. CV 13-02939 SJO (JCx), 2014 U.S. Dist. LEXIS 180513 (C.D. Cal. May 2, 2014) . passim

*In re JPMorgan Chase & Co. Secs. Litig.*,
   MDL No. 1783, C.A. No. 06 C 4674, 2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007)
   .................................................................................................... 22

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................. 15

*In re MONY Grp. Inc. S'holders Litig.*,
   852 A.2d 9 (Del. Ch. 2004)........................................................................... 17

*In re Netsmart Techs., Inc. S'holders Litig.*,
   924 A.2d 171 (Del.Ch. 2007)..................................................................... 16, 20

*In re Pure Res. Inc. S'holders Litig.*,
   808 A.2d 421 (Del. Ch. 2002)........................................................................ 16

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007) .......................................................... 14, 15

*J. I. Case Co. v. Borak*,
   377 U.S. 426 (1964).................................................................................... 14

*Kentrox, Inc. v. Bernstein*,
   No. 3:13-CV-01492-ST, 2014 U.S. Dist. LEXIS 118915 (D. Or. May 9, 2014) ................... 15

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375, 389 (1970)......................................................................... 14, 24

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977).................................................................................... 14

*SEC v. Texas Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968)............................................................................. 16

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ......................................................................... 13

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)................................................................................ 14, 15

*Vaughn v. Teledyne*,
  628 F.2d 1214 (9th Cir. 1980) ....................................................................... 20

*Walker v. Action Indus.*,
  802 F.2d 703 (4th Cir. 1986) ......................................................................... 19

*Wilson v. Hewlett-Packard Co.*,
  668 F.3d 1136 (9th Cir. 2012) ....................................................................... 13

**Rules**

Fed. R. Civ. P. 12....................................................................... 1, 12, 13, 24
Fed. R. Civ. P. 8.................................................................................... 12

Plaintiffs Elia Azar and Dean Alfange (collectively, "Plaintiffs") respectfully submit this Opposition to the Blount Defendants' Motion to Dismiss (the "Motion") Plaintiffs' Amended Class Action Allegation Complaint (the "Complaint"). As explained herein, Plaintiffs' Complaint adequate states claims under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), against Blount International, Inc. ("Blount" or the "Company") and Joshua L. Collins, David A. Willmott, Robert E. Beasley, Jr., Ronald Cami, Andrew C. Clarke, Nelda J. Connors, E. Daniel James, Harold E. Layman, Max L. Lukens, and Daniel J. Obringer (collectively, the "Board" or the "Individual Defendants," and with Blount, the "Blount Defendants").

## PRELIMINARY STATEMENT

A fundamental aspect of a motion to dismiss under Rule 12(b)(6) is that allegations of fact are accepted as true. Moreover, plaintiffs are entitled to all reasonable inferences in their favor. In moving against the Complaint, however, the Blount Defendants ignore this basic principle and attempt to use their brief to tell a different story, to spin the facts in their favor. Indeed, their entire argument hangs on a construct that contradicts Plaintiffs' well-pled facts.

This dispute arises out of the acquisition of Blount for $10 per share, or a total of $855 million (the "Buyout"), by a consortium consisting of American Securities, LLC ("American Securities"), P2 Capital Partners LLC ("P2"), and affiliated entities formed to facilitate the Buyout (collectively, the "Buyout Group"). Blount executives Collins ("Collins") and Willmott ("Willmott"), who also sat on and led the Board, both negotiated and participated in the Buyout. During the process leading up to the Buyout, Collins and Willmott created a set of financial projections in or around September 2015 that best reflects the Company's long-term business potential (the "September Projections"). As Blount received a proposal from the Buyout Group that fell below a valuation range implied by the September Projections, Collins and Willmott

slashed the Company's purported outlook and created two other sets of financial projections—the "November Projections" and the "December Projections"—that would support the Buyout price. The November Projections and December Projections, which Plaintiffs allege were unreasonably reduced and reflect an overly pessimistic view, were then used by the Board's financial advisors, Goldman, Sachs & Co. ("Goldman") and Greenhill & Co., Inc. ("Greenhill"), to perform financial analyses depicting the purported fairness of the Buyout price, which Plaintiffs contend is inadequate.

While the diminished November Projections and December Projections were peddled to Blount stockholders in the definitive Schedule 14A Proxy Statement (the "Proxy Statement") filed with the U.S. Securities and Exchange Commission (the "SEC"), the more apt September Projections were wholly omitted. These allegations must be accepted, and the Court should reject the Blount Defendants' attempt to recast the September Projections as outdated and unreliable and to depict the November Projections and December Projections as the best estimates of Blount's future financial performance. The Blount Defendants will have ample opportunity to contest Plaintiffs' allegations—at trial, or on a summary judgment motion—but a motion to dismiss is not the forum for deciding facts.

The problem with the Proxy Statement is twofold: *first*, Blount stockholders were misled about the efficacy of the financial analyses and fairness opinions touting the fairness of the Buyout that relied on the later projections; *and second*, stockholders were kept in the dark about Blount's true prospects. Under prevailing law in the Ninth Circuit and elsewhere, this constitutes a material misrepresentation and omission. Moreover, having established materiality, the remaining elements, negligence and loss causation, inherently follow.

Accordingly, the Court should deny the Motion.

## STATEMENT OF FACTS

### I.    The Parties and Relevant Non-Parties

<u>Plaintiffs</u>

Plaintiffs Azar and Alfange were, and had been at all relevant times, holders of Blount common stock. On July 1, 2016, Plaintiffs were appointed as Lead Plaintiffs under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). (Compl. ¶ 16.)

<u>Corporate Defendants</u>

Defendant Blount was a Delaware corporation headquartered in Portland, Oregon. Its common stock traded on the New York Stock Exchange under the ticker symbol "BLT." Before the Buyout, Blount was a leading global manufacturer and marketer of replacement parts, equipment, and accessories for the forestry, lawn, and garden; farm, ranch, and agriculture; and concrete cutting and finishing markets. (*Id.* at ¶ 17.)

Defendant American Securities, part of the Buyout Group, is a private equity firm that invests in market-leading North American companies with annual revenues generally ranging from $200 million to $2 billion or $50 million to $200 million of EBITDA. (*Id.* at ¶ 29.)

Defendant P2, also part of the Buyout Group, is a privately owned hedge fund sponsor and former Blount stockholder. When the Buyout was announced, P2 held approximately 15% of Blount's common stock. (*Id.* at ¶¶ 3, 30 )

Defendants ASP Blade Intermediate Holdings, Inc. ("Merger Parent") and ASP Blade Merger Sub, Inc. ("Merger Sub"), both parts of the Buyout Group, are Delaware corporations

and wholly-owned subsidiaries of American Securities that were created to effectuate the Buyout. (*Id.* at ¶¶ 31, 32.)[1]

The Individual Defendants

Defendant Collins served as a member of the Board since January 2005, as Blount's Chairman since May 2010, and as the Company's CEO since December 2009 through the Buyout. Collins also acted as President, Chief Operating Officer & CEO Designate as of October 19, 2009. Collins has a long history and relationship with the financial industry. He worked for Lehman Brothers Inc. (including affiliates, "Lehman") from 1996 until the bank's collapse in 2008. Thereafter, alongside co-defendant Willmott, he formed Collins Willmott & Co. LLC ("Collins Willmott"), a private equity firm located in New York City. Following the Buyout, Collins remained the Company's Chief Executive Officer and also agreed to rollover a significant portion of his Blount equity holdings into the post-close entity. Separately, Collins received a grant of options to purchase up to 6% of the fully diluted common shares of the post-close entity. Collins was also conflicted because he stands to receive $4,591,650 in change-of-control payments (in the event he is terminated post-close) as well as $1,266,780 from vested stock options and vested and unvested RSUs. Collins was also expected to serve on the board of directors of the post-close entity. In its most recent annual proxy statement before the Buyout, Blount admitted that Collins was not independent. (*Id.* at ¶ 18.)

Defendant Willmott served as Blount's President and Chief Operating Officer from March 2011 and as a member of the Board from March 2012 through the Buyout. Willmott previously served as the Company's Senior Vice President—Corporate Development & Strategy.

---

[1]    Plaintiffs intend to dismiss their claims against American Securities, P2, Merger Parent, and Merger Sub.

As with Collins, Willmott has a long history and relationship with the financial industry. He worked for Lehman from 1997 until the bank's collapse in 2008. Thereafter, he co-founded Collins Willmott. Like Collins, Willmott also stayed with the Company post-Buyout and also agreed to rollover a significant portion of his Blount equity holdings into the post-close entity. Separately, Willmott received a grant of options to purchase up to 6% of the fully diluted common shares of the post-close entity. Willmott was also expected to serve on the board of directors of the post-close entity. Willmott is also interested because he stands to receive $2,896,416 in change-of-control payments (in the event he is terminated post-close) as well as $599,170 from vested stock options and vested and unvested RSUs. In its most recent annual proxy statement before the Buyout, Blount admitted that Willmott was not independent. (*Id.* at ¶ 19.)

Defendant Robert E. Beasley, Jr. ("Beasley") was a member of the Board from January 1, 2010 and its Lead Director from December 7, 2011 through the Buyout. Apart from Blount, since 1991 Beasley has also served as an executive or director of Hunter Fan Company, where defendant Willmott also served as chairman of the board. Moreover, Beasley led Hunter Fan until it was acquired by Lehman in a transaction led on the buy-side by Collins and Willmott. (*Id.* at ¶ 20.)

Defendant Ronald Cami ("Cami") was a member of the Board from December 2010 through the Buyout. Cami is a longtime attorney, and during private practice he has represented and worked closely with Lehman, working side by side with Collins. Cami has also worked with American Securities. Thus, Cami has substantial ties to Collins, Willmott, and the members of the Buyout Group. (*Id.* at ¶ 21.)

Defendant Andrew C. Clarke ("Clarke") was a member of the Board from May 2010 through the Buyout. (*Id.* at ¶ 22.)

Nelda J. Connors ("Connors") was a member of the Board from March 2012 through the Buyout. (*Id.* at ¶ 23.)

Defendant E. Daniel James ("James") was a member of the Board from August 1999 through the Buyout. Apart from Blount, James worked for Lehman until its demise in 2008. Since then, James has worked for Trilantic North America, a private equity investment firm and successor to a Lehman entity. James has also served on other boards of directors with Collins, including Phoenix Brands LLC. (*Id.* at ¶ 24.)

Defendant Harold E. Layman ("Layman") was a member of the Board from 1999 through the Buyout and was previously the Company's President from February 2000 to August 16, 2002, Chief Executive Officer from March 2001 to August 16, 2002, and Chief Operating Officer from February 2000 to 2001. (*Id.* at ¶ 25.)

Defendant Max L. Lukens ("Lukens") was a member of the Board from July 31, 2015 through the Buyout. Lukens is also a director of Westlake Chemical Corporation, a petrochemicals company that has a longstanding relationship with Blount financial advisor Goldman. (*Id.* at ¶ 26.)

Daniel J. Obringer ("Obringer") was a member of the Board from April 2014 through the Buyout. (*Id.* at ¶ 27.)

## II.    Overview of the Facts Giving Rise to the Action

P2 indicated an interest in acquiring the Company—and retaining the Company's management post-transaction—as early as January 2014. P2 later teamed up with American Securities to form the Buyout Group in furtherance of its quest to acquire Blount. (*Id.* at ¶ 41.)

On August 6, 2015, the Buyout Group submitted an informal indicative proposal to acquire Blount at a price range of $11.00 to $12.50 per share. The Buyout Group also indicated it intended to retain defendants Collins and Willmott, Blount's President and Chief Operating Officer, respectively, after the close of the Buyout. Thus, from the very beginning, Collins and Willmott had a special interest in the Buyout separate and distinct from the interests of other Blount stockholders. At a meeting shortly thereafter, the Board determined that Collins and Willmott could continue to work with the Buyout Group in pursuit of a deal despite their clear conflict. (*Id.* at ¶¶ 42-43.)

During the process leading up to the announcement of the Buyout, Blount's management created sets of financial projections to help gauge offers to buy the Company. At least in theory, management financial projections are supposed to reflect the best estimates of a given company's future financial performance. (*Id.* at ¶¶ 55, 64.)

On September 9, 2015, the Board met to discuss the Buyout Group's offer to acquire the Company. Goldman also attended and made a presentation containing preliminary financial analyses regarding the Buyout Group's offer. (*Id.* at ¶ 59.)

The Board's invitation to Goldman is deeply troubling given the bank's extensive ties to the Buyout Group. More specifically, Goldman has worked with and for American Securities or its affiliates on many occasions in recent years. Moreover, Goldman has also worked with P2. (*Id.* at ¶¶ 73-85.)

Goldman's September 9 presentation included a discounted cash flow ("DCF") analysis, for which the key input was the September Projections. The DCF analysis is widely recognized as the most probative of a company's intrinsic value and the biggest driver in valuation analyses.

Thus, manipulating financial projections can yield highly misleading valuation ranges in a DCF analysis. (*Id.* at ¶¶ 59, 70.)

In October, after Goldman had presented its financial analyses using the September Projections, Blount management (namely, Collins and Willmott) told the Buyout Group that it "anticipated improved third quarter results and provided greater certainty that the Company would meet year-end targets as compared with the preliminary reports provided to the Buyer Parties prior to October 8, 2015." (*Id.* at ¶ 67.)

Despite touting Blount's strong potential to the Buyout Group, Collins and Willmott conveyed to the Board a very different story. The Proxy Statement, while deliberately vague, indicates that Blount's management told a conflicted Goldman that the September Projections "were no longer current" and that management would be revising the September Projections downward. (*Id.* at ¶ 60.)

On October 15, 2015, Goldman relayed to the Board management's notion that the September Projections were no longer current and, thus, needed to be adjusted downward. As inferred from the Proxy Statement, the Board never directly engaged Collins or Willmott to ascertain whether the alleged reasons for reducing the September Projections were legitimate despite their known conflicts. Nonetheless, based solely on Goldman's untested hearsay, the Board agreed that management should prepare another set of financial projections. (*Id.* at ¶¶ 61-63.)

Just a few weeks later, on November 9, 2015, Blount reported its financial results for the third quarter ended September 30, 2015 ("Q3"), posting quarter-to-quarter gains across several key financial metrics. Specifically, Blount reported operating income of $14.1 million for Q3, compared to a $47.3 million loss in the second quarter of 2015("Q2"); $29.8 million

consolidated adjusted EBITDA in Q3 compared to $26.9 million in Q2; and a $12.3 million in Q3 compared to a $49.5 million net loss in Q2. The Company also announced that it had taken additional actions in Q3 to align production rates and spending with updated 2015 outlook. Significantly, Blount did not publicize any information that would warrant slashing its financial projections. (*Id.* at ¶¶ 65-66.)

Thereafter, on November 17, 2015, a special committee of the Board (the "Committee")[2]—ostensibly established to insulate against the potential conflicts of interest impinging on Collins and Willmott—approved the Buyout Group's request to meet with Collins and Willmott and discuss the terms of their post-transaction employment. The Committee was unable to safeguard against such conflicts because of its members' extensive entanglements with Collins, Willmott, and the members of the Buyout Group. The Committee also failed because Collins and Willmott continued to play a key role in the process by engaging with the Buyout Group and assuming control over Blount's financial projections. Accordingly, the Company's management was negotiating the terms of their post-transaction employment before the Merger Agreement was even executed, before the expiration of the merely perfunctory go-shop (described below), and while other potential buyers remained interested in a potential acquisition. (*Id.* at ¶ 45.)

What happened next in the already substantively exclusive and irremediably conflicted sales process reduced the process to a fire sale. On December 4, 2015, the Buyout Group said it was reducing its offer for the Company to only $9.85 per share after the Buyout Group had failed

---

[2]    The Committee included defendants Beasley, Cami, Lukens, and Obringer. However, Plaintiffs allege that the Committee members were unable to exercise any independent judgment because of their ties to Collins, Willmott, the Buyout Group, and Goldman Sachs. (*Id.* at ¶ 45 n.1.)

to secure financing of the transaction at $10.80 per share for several weeks, *i.e.*, not because Blount's value had dropped. The next day, the Committee, which less than two months earlier requested at least $11.00 per share, countered the Buyout Group's reduced offer with a request for $10.30 per share. Two days later, on December 7, 2015, the Buyout Group offered a final offer of only $10.00 per share, down substantially from the $10.80 per share previously offered. (*Id.* at ¶¶ 46, 47.)

On December 8, 2015, the Committee quickly accepted the Buyout Group's final offer without contacting an entity referred to in the Proxy Statement as "Party C," which had expressed interest in acquiring Blount and was still conducting due diligence. The Board accepted and approved the Buyout the very next day, and Blount entered into the Merger Agreement to be acquired by the Buyout Group. At both of these meetings, Goldman and the Company's second financial advisor, Greenhill, which was purportedly retained to mitigate the impact of Goldman's potential conflicts of interest,[3] presented the result of the DCF analyses that incorporated the December Projections. (*Id.* at ¶¶ 48-49.)

On December 10, 2015, Blount issued a press release announcing the Buyout. Because of the circumscribed process, the Merger Agreement included a "go-shop" provision permitting Blount to solicit topping offers for a limited period of time, during which time the termination fee would be reduced from $14.7 million to $7.3 million. Still, Defendants Collins and Willmott were actively involved in soliciting interested parties during the go-shop period despite their obvious conflicts of interest. Goldman was also tasked as co-lead financial advisor in connection

---

[3]    Despite Greenhill's being retained to guard against Goldman's conflicts, Greenhill was similarly entangled with members of the Buyout Group. Specifically, one of Greenhill's senior advisors serves as a member of an advisory board at American Securities. (*Id.* at ¶ 85.)

with the go-shop process, despite Goldman's clear motivation to favor American Securities and to a lesser extent, P2. (*Id.* at ¶ 50-51.)

On January 29, 2016, Blount announced that the go-shop period had concluded and that the Company would be proceeding with the Buyout. (*Id.* at ¶ 52.)

On March 9, 2016, Blount filed the Proxy Statement with the SEC, announcing that the special meeting at which Blount stockholders would be asked to vote on the Buyout would occur on April 7, 2016 at 10 a.m. E.D.T. On April 7, 2015, a majority of Blount's shares of common stock were cast in favor of the Buyout; and on April 12, 2016, the Buyout was completed. (*Id.* at ¶¶ 6, 53.)

### III.    Procedural History

On March 21, 2016, Plaintiffs commenced this Action, alleging misrepresentations and omissions in the Proxy Statement. (Docket No. 1.)

That same day, Plaintiffs also filed a motion for a preliminary injunction (Docket No. 2), which sought to enjoin the April 7, 2016 shareholder vote on the Buyout, and a related motion for expedited discovery and proceedings (Docket No. 3), which sought to accelerate the schedule in consideration of the preliminary injunction motion.

On March 25, 2016, Defendants opposed Plaintiffs' motion to expedite. (Docket No. 25.) On March 27, 2016, Plaintiffs filed their reply brief. (Docket No. 28.) On March 29, 2016, the Court denied Plaintiffs' motion to expedite (Docket No. 38), and Plaintiffs subsequently withdrew their motion for a preliminary injunction (Docket No. 39).

Because Plaintiffs brought this case under the PSLRA, they issued the statutorily required notice on April 11, 2016. On June 10, 2016, Plaintiffs moved to be appointed Lead Plaintiffs under the PSLRA, and to have their choice of counsel—Johnson & Weaver, LLP and Levi & Korsinsky LLP as Lead Counsel and McGaughey Erickson as Local Counsel—approved.

(Docket No. 42.) On July 1, 2016, the Court granted Plaintiffs' motion under the PSLRA. (Docket No. 46.)

On August 1, 2016, Plaintiffs filed their Complaint, which is the operative pleading in this Action. On September 16, 2016, Defendants all moved to dismiss the Complaint. Plaintiffs now oppose the Blount Defendants' motion.

## ARGUMENT

### I.    Applicable Standard of Adjudication

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissal is appropriate only "when there is no cognizable legal theory to support the claim, or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief." *Erickson v. Blake*, 839 F. Supp. 2d 1132, 1134 (D. Or. 2012) (citing *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010)). In other words, all a plaintiff must do is demonstrate that the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Asking for *plausible* grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claim. *Twombly*, 550 U.S. at 556 (emphasis added); *see also Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). Rule 12(b)(6) must also be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003).

"When considering a Rule 12(b)(6) motion, the court may only consider matters and materials contained within the parties' pleadings (the complaint and answer)." *Erickson*, 839 F. Supp. 2d at 1135 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). Moreover, in evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Further, all reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

At bottom, a district court ruling on a motion to dismiss is not sitting as a trier of fact. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The Court is not required, at this stage, to even believe Plaintiffs' allegations. *Twombly*, 550 U.S. at 556 (*citing Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.")). As stated in *Twombly*, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. at 556 (citations omitted).

As explained herein, Plaintiffs' Complaint alleges sufficient facts to support their claims against the Blount Defendants, so the Motion should be denied.

## II. Plaintiffs Have Adequately Pled Claims Against the Blount Defendants for Violating Section 14(a) of the Exchange Act

### A. Pleading Requirements Under Section 14(a) and Rule 14a-9

Section 14(a) reflects Congress' decision in 1934 to mandate full disclosure in the context of stockholder votes. The Supreme Court explained 50 years ago: "The purpose of § 14 (a) is to prevent management or others from obtaining authorization for corporate action by means of

deceptive or inadequate disclosure in proxy solicitation." *J. I. Case Co. v. Borak*, 377 U.S. 426,

431 (1964) ("The section stemmed from the congressional belief that 'fair corporate suffrage is an

important right that should attach to every equity security bought on a public exchange.'" (quoting

H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13)). *See also Santa Fe Indus., Inc. v. Green*, 430 U.S.

462, 477 (1977) (discussing the "philosophy of full disclosure" underlying Section 14(a) of the

Exchange Act and SEC Rule 14a-9 promulgated thereunder).

To prevail on a claim under § 14(a) of the Exchange Act, a plaintiff must demonstrate:

"(1) defendants made a material misrepresentation or omission in a proxy statement; (2) with the

requisite state of mind; and (3) that the proxy statement was the transactional cause of harm of

which plaintiff complains." *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015 (N.D.

Cal. 2007) (citing *Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 384 (1970)).[4]

"An omitted fact is material if there is a substantial likelihood that a reasonable

shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway,*

*Inc.*, 426 U.S. 438, 439 (1976). Establishing materiality:

> [D]oes not require proof of a substantial likelihood that disclosure of the omitted
> fact would have caused [a] reasonable investor to change his vote. What the
> standard does contemplate is a showing of a substantial likelihood that, under all
> the circumstances, the omitted fact would have assumed actual significance in the
> deliberations of the reasonable shareholder.

---

[4]   Notably, "[w]here the misstatement or omission in a proxy statement has been shown to
be 'material,'" shareholders are presumed to have "made a sufficient showing of causal
relationship between the violation and the injury for which he seeks redress" so as to satisfy the
transactional cause of harm requirement of a Section 14(a) violation. *Mills*, 396 U.S. 375, 384-85
(1970). Accordingly, Plaintiffs need not independently establish that the false and misleading
Proxy Statement was the "transactional cause" of its injury where the materiality of the non-
disclosures is established.

---

PLAINTIFFS' OPPOSITION TO THE BLOUNT DEFENDANTS' MOTION TO DISMISS   14

*Id.* at 449; *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).[5] As even this Court has even recognized, a fact is material if it "might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." *Beebe v. Pac. Realty Tr.*, 99 F.R.D. 60, 66 (D. Or. 1983). A material misrepresentation or omission need not be intentional for liability to be imposed; rather, plaintiff need only plead facts giving rise to an "*inference of negligence.*" *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000); *Zoran*, 511 F. Supp. 2d at 1015 ("negligence will suffice as to the degree of culpability" required for establishing a Section 14(a) violation).

**B.    The Proxy Statement Was Materially False and Misleading Because It Omitted the September Projections and Included the Manipulated November Projections and December Projections**

Plaintiffs' premise is simple—the September Projections were the best estimate of Blount's financial prospects, and it was actionably deceptive for the Blount Defendants to (1) exclude those figures from the Proxy Statement and (2) put forward the artificially watered down November Projections and December Projections as depicting Blount's financial prospects.

Under established law, financial information like the September Projections is material and should be disclosed. As the Ninth Circuit has expressly stated, "investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest." *United States v. Smith*, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998) (adding, "Surely, the average

---

[5]    Delaware courts, which Oregon courts look to on matters of corporate governance, recognize the same standard of materiality as the Supreme Court did in *TSC. See, e.g., Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting the *TSC Industries* standard as the law of Delaware). Federal courts have also looked to Delaware in matters involving disclosure in merger cases. *E.g., Kentrox, Inc. v. Bernstein*, No. 3:13-CV-01492-ST, 2014 U.S. Dist. LEXIS 118915, at *28 (D. Or. May 9, 2014) (citing *Plumbers Local No. 137 Pension Fund v. Davis*, Civ. No. 03:11-633-AC, 2012 U.S. Dist. LEXIS 5053, at *9 n.3 (D. Or. Jan. 11, 2012)) ("However, as do courts in many other states, Oregon courts often look to Delaware law for guidance . . . .").

---

investor's interest would be piqued by a company's internal projections . . . ."). Other courts
have recognized that financial projections are "among the most highly-prized disclosures by
investors." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del.Ch. 2007); *see
also In re Emerging Commc'ns, Inc. S'holder Litig.*, C.A. No. 16415, 2004 Del. Ch. LEXIS 70,
at *134 (Del. Ch. May 3, 2004) (finding projections "highly material" because knowledge of the
projections "would have enabled the shareholders to understand [the company's] intrinsic worth
and the extent of the market's undervaluation of their company"); *see also SEC v. Texas Gulf
Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) ("Material facts include not only information
disclosing the earnings and distributions of a company but also those facts which affect the
probable future of the company and those which may affect the desire of investors to buy, sell, or
hold the company's securities.").

When shareholders are faced with a decision like Blount stockholders were here—vote
"YES" and approve the Buyout or vote "NO" and stay the course as a standalone entity—there is
likely no more important information than management's best estimate of future financial
performance. This is because "management ordinarily has the best first-hand knowledge of a
company's operations," and the projections play a key role in any valuation analyses being
prepared. *Doft & Co. v. Travelocity.com Inc.*, C.A. No. 19734, 2004 WL 1152338, at *5 (Del.
Ch. May 20, 2004). As *Netsmart* made clear, "Investors can come up with their own estimates of
discount rates or . . . market multiples," but cannot replicate insiders "view of the company's
prospects"). *Id.*, 924 A.2d at 203.

It is also well-established that, "[w]hen a document ventures into certain subjects, it must
do so in a manner that is materially complete and unbiased by the omission of material facts." *In
re Pure Res. Inc. S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002); *In re MONY Grp. Inc.*

*S'holders Litig.,* 852 A.2d 9, 24-25 (Del. Ch. 2004) (explaining that directors are obligated to provide stockholders with an accurate, full, and fair characterization of events once they travel down the road of a "partial disclosure.").

*In re Hot Topic, Inc. Securities. Litigation*, No. CV 13-02939 SJO (JCx), 2014 U.S. Dist. LEXIS 180513 (C.D. Cal. May 2, 2014), is instructive. Indeed, *Hot Topic* involves an even less egregious situation than here. There, the company disclosed an earlier, more optimistic set of projections and a later, more pessimistic set of projections. *Id.* at *7. The proxy statement stated the Hot Topic's board and management deemed the second set more realistic, and the financial advisor's analyses and resulting fairness opinion relied on the latter set of projections. *Id.* at *4-7. The court in *Hot Topic* acknowledged that the second set purportedly "better reflect[ed] what management believed the company would be able to achieve during the next five years compared to [an earlier set of] projections." *Id*. at *7. Nonetheless, the court found that the plaintiff alleged "enough facts to support the conclusion that the company moderated its financial projections downward to underestimate the financial value of its stock. . . . [A]t this point, it is at least plausible that Defendants' changes to Hot Topic's financial projections resulted in a less accurate forecast." *Id*. at *16-17. Thus, as articulated in *Hot Topic*, "which of two projections is more accurate would be important to a reasonable shareholder trying to determine if a stock buyout is a fair deal…the inclusion of both projections in the proxy statement in reasonable detail does not excuse the allegedly false information regarding the relative accuracy of the two projections. This information was allegedly designed to mislead shareholders into weighing the revised projections more heavily than [the earlier projections], which could cause them to undervalue their stock. A reasonable shareholder would find the relative accuracy and achievability of the two projections helpful." *Id.* at *22 (finding plaintiff successfully plead that the defendants

knowingly misstated material facts concerning the relative accuracy of two sets of projections where plaintiff alleged that the board recommendation and fairness opinion were based on less accurate, downward-moderated revised projections).

Here, despite the fact that the September Projections most accurately reflected Blount's financial prospects, as Plaintiffs allege, Defendants refused to disclose the September Projections and, instead, disclosed the November Projections and the December Projections. As set out in Plaintiffs' Complaint, Blount reported operating income of $14.1 million for the third quarter of 2015, compared to a $47.3 million loss in the second quarter of 2015; $29.8 million consolidated adjusted EBITDA in Q3 compared to $26.9 million in Q2; and a $12.3 million net income in Q3 compared to a $49.5 million net loss in Q2. (Compl. ¶ 66.) The Proxy Statement also announced that management "anticipated improved third quarter results and provided greater certainty that the Company would meet year-end targets as compared with the preliminary reports provided to the Buyer Parties prior to October 8, 2015." (*Id.* at ¶ 67.) Thus, despite Defendants' arguments that Plaintiffs' Complaint is "cherry-picked" and that the Company's financial trajectory was in fact declining (the latter of which should be disregarded at this stage), Plaintiffs have demonstrated it is *at least plausible* that changes to the financial projections resulted in a less accurate forecast. *See Hot Topic*, 2014 U.S. Dist. LEXIS 180513, at *16-17. Without this material information, Blount stockholders were unable assess Blount's true financial potential. In other words, Blount stockholders needed this omitted information to make a fully-informed decision as to whether the consideration being offered in the Buyout adequately compensated them for their ownership interest in the Company.

Moreover, as in *Hot Topic*, given Plaintiffs' allegations about the utility and propriety of the September Projections, the Blount Defendants' disclosure of the November Projections and

the December Projections, as well as the financial analyses performed by Goldman and Greenhill and the resulting fairness opinions, rendered the Proxy Statement materially misleading. Related, the concomitant failure to disclose the September Projections prevented Blount stockholders from assessing for themselves the reasonableness of the adjustments that resulted in the November Projections and December Projections.[6]

The Blount Defendants' main retort is that the September Projections are not the best estimate and that the newness of the November Projections and December Projections makes them better. For instance, the Blount Defendants attempt to cast the September Projections as "superseded" (Blount Defs. Br. at 18), "out-of-date" (*id.*), or "too rosy" (*id.* at 22). Conversely, they attempt to champion the superiority of the November Projections and the December Projections. (*Id.* at 21-22.)  But issues of fact should be decided at trial or on summary judgment, not at this stage of the proceedings. The Blount Defendants' approach flouts well-established rules regarding motions to dismiss and should be flatly rejected.

The Blount Defendants also suggest that financial projections are "not generally required in proxy statements." (Blount Defs.' Br. at 19 (citing *Assad v. Mines Mgmt.*, 2016 U.S. Dist. LEXIS 119544, at *11 (E.D. Wash. Sept. 6, 2016)). However, *Assad* appears to have relied upon an outdated view of the law. Specifically, *Assad* cited a case referring to the SEC's long ago caution against disclosing projections, *see id*. at 11 (citing *Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000)), but the SEC has long since retreated from its initial position, *see Walker v. Action Indus.*, 802 F.2d 703, 707 (4th Cir. 1986) ("The traditional SEC position, however, encountered substantial criticism in the early 1970s. . . . Then, in 1976, the SEC deleted earnings

---

[6]    The Blount Defendants failed to argue several issues that were addressed in *Hot Topic*, including subjective falsity and objective falsity, so they cannot address those issues on reply. Nonetheless, Plaintiffs' factual allegations establish all of the elements discussed in *Hot Topic*.

projections in the 14a-9 note from the list of potentially misleading disclosures." (citations

omitted)). Indeed, the authorities cited herein make clear that false and misleading or inadequate

disclosure of financial projections is against the law. *Vaughn v. Teledyne*, 628 F.2d 1214, 1221

n7 (9th Cir. 1980) (explaining that a partial disclosure of a projection may require additional

disclosures to ensure completeness and accuracy). *Assad* is distinguishable on the facts because it

involved a preliminary injunction motion, and the plaintiff there was unable to meet the

evidentiary burden. *Assad*, 2016 U.S. Dist. LEXIS 119544, at *1. Moreover, in *Assad* there was

no disclosure regarding the company's projections. 2016 U.S. Dist. LEXIS 119544, at *12. Here,

however, the Blount Defendants affirmatively disclosed the manipulated November Projections

and December Projections and omitted the more apt September Projections. *Assad* is, therefore,

inapposite.

The Blount Defendants' reliance upon *Netsmart* is also unavailing. There, the plaintiffs

initially appeared to have sought disclosure of an earlier set of projections, but at oral argument it

became clear that the plaintiffs were interested only in the result of a price-to-earnings (P/E)

analysis using the earlier, more pessimistic set of projections. In rejecting the plaintiffs' request,

the Delaware Court of Chancery explained that "using the dated . . . projections as a basis for an

independent valuation of . . . future earnings would demonstrate only that the merger

consideration offered was 'fairer' to the selling shareholders than the projections presented in the

proxy imply. As such, that portion of the [undisclosed] model would not materially influence any

rational shareholder's vote, and no duty was breached by its omission." *Netsmart*, 924 A.2d at

200-201. In plain contrast to *Netsmart*, thus obviating its applicability, the earlier September

Projections presented a more optimistic view—"more bullish," as the Blount Defendants

themselves concede (Blount Defs. Br. at 19)—of the November Projections and December

Projections that were used to justify the inadequate Buyout.

Based on the foregoing, the omission of the September Projections and the inclusion of

the November Projections and December Projections rendered the Proxy Statement materially

misleading and inadequate.

### C.    Plaintiffs Adequately Alleged That the Blount Defendants Acted with Negligence

Defendants contend that Plaintiffs have failed to adequately plead the requisite level of

culpability. (Blount Defs.' Br. at 23-25.) As Defendants concede under § 14, Plaintiffs need only

establish the Individual Defendants were negligent in making the alleged false statements in the

Proxy. 15 U.S. C. §78u-4(b)(2); *Hot Topic Sec. Litig.*, 2014 U.S. Dist. LEXIS 180513, at *27

(citations omitted). Plaintiffs have met their burden here.

Specifically, Plaintiffs allege that Blount management posted "sequential quarter-to-

quarter gains," including significant gains for the third quarter of 2015 (Compl. ¶¶ 65-66) and

that Blount management told the Buyout Group in October 2015 that the Company '"anticipated

***improved*** third quarter results" and was on track to meet its year-end targets (*id.* at ¶ 67

(emphasis added)). Thus, Defendants knew they had no justification for slashing the undisclosed

September Projections. (*Id.* at ¶¶ 64, 68.) Yet the Board allowed a conflicted Collins and

Willmott to reduce the September Projections in order to lower the implied price in Goldman's

DCF analysis and make the Buyout price appear fair for their own personal gain. (*Id.* at ¶¶ 9-10,

60, 69.)[7] The higher and more accurate September Projections, which were in line with Blount's

---

[7]    Goldman, of course, was incentivized to make the Buyout price appear fair in order to
obtain its lucrative transaction fee and secure future business. (Compl. ¶¶ 73-87.)

financial performance and representations made to the Buyout Group, were not disclosed to shareholders in order to induce them to vote for the Buyout at an inadequate price.

Plaintiffs allege that the Individual Defendants were involved in preparing the Proxy, or, at the very least, reviewed the contents of the Proxy before it was filed with the SEC, and therefore knew or were negligent in not knowing that the Proxy failed to include the material information detailed herein. (*Id.* at ¶¶ 91-92.) Indeed, Defendants admit that they did not disclose the omitted information (arguing instead that they did not have a duty to do so), and concede that they had access to the information. (Blount Defs.' Br. at 16-23.)

The above allegations are more than sufficient to show that it is at least plausible the Individual Defendants, and therefore Blount, acted negligently in preparing the Proxy. *City of Westland Police & Fire Ret. Sys. v. Sonic Sols*., No. C 07-05111 CW, 2009 U.S. Dist. LEXIS 33339, at *28 (N.D. Cal. Apr. 6, 2009) (allegations supported strong inference of directors' negligence in failing to disclose backdating scheme because they had duties associated with approving proxy statements and were responsible for ensuring statements "were truthful and accurate"); *see also Hot Topic*, 2014 U.S. Dist. LEXIS 180513, at * 27.

As the *City of Westland Police* Court held, allegations that the Board was "responsible for ensuring that Sonic's public statements describing and accounting for these options were truthful and accurate…are sufficient to raise an inference that Defendants knew or should have known that Sonic's proxy statement was false." *Id*. at *15; *see also In re JPMorgan Chase & Co. Secs. Litig.,* MDL No. 1783, C.A. No. 06 C 4674, 2007 U.S. Dist. LEXIS 93877, at *22-*23 (N.D. Ill. Dec. 18, 2007) (allegations that director defendants were in contact with the parties that had knowledge of the omitted information, "and had the opportunity to monitor and inquire" are sufficient to plead negligence under the PSLRA.). Nothing more is required.

Nevertheless, Defendants contend that Plaintiffs have failed to plead any negligent behavior by the Individual Defendants because Plaintiffs do not allege how the disclosed projections (*i.e.*, the November and December Projections) were "unreasonable or manipulated." (Blount Defs.' Br. at 24.) This argument misses the point. A finding of Defendants' negligence turns on the materiality of the September Projections and not, as Defendants suggest, the manipulation of the November and December Projections. *See e.g.*, *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973) (holding that negligence suffices for claim based on misleading proxy statement and that plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts"); *Brown v. Brewer*, No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863, at *80-82 (C.D. Cal. June 17, 2010) ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [] negligence standard.") (internal citation omitted).

Accordingly, if the omission of the September Projections from the Proxy is deemed to be material, then a finding of negligence necessarily follows. *See e.g.*, *Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at *80-82 ("Since we have denied summary judgment with respect to three of the proffered material omissions in the Proxy, and Defendants have admitted to participating in "the process of preparing, reviewing, and disseminating" that Proxy, we must also DENY summary judgment with respect to the element of negligence. If Plaintiff can persuade a jury as to both materiality and Defendants' participation in the preparation and/or review of the Proxy at trial, then a finding of negligence will flow from those findings.").

In any event, although not required, Plaintiffs also allege Defendants and, in particular Collins and Willmott, knowingly manipulated the September Projections downward to ensure a

deal with the Buyout Group for their own financial and personal gains. These facts more than amply create a plausible inference that Defendants were negligent in the preparation of the Proxy.

### D.    Plaintiffs Have Adequately Alleged Loss Causation

Defendants incorrectly contend that Plaintiffs have failed to state a Section 14(a) claim because they have not adequately alleged loss causation. Blount Defs.' Br. at 25-26. As an initial matter, "the causation issue becomes most critical at the proof stage, and the question of whether the plaintiff has proven causation is usually reserved for the trier of fact." *In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 66 (D. Del. 2002); *St. Clare v. Gilead Scis., Inc*, 536 F.3d 1049, 1057 (9th Cir. 2008) (Same and noting "[s]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.").

Under Section 14(a), the causation requirement is satisfied where, as here, the challenged proxy statement "was an essential link in the accomplishment of the transaction." *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 389, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970). Stockholders may satisfy the "essential link" requirement by alleging former stockholders were precluded from casting a fully informed vote in connection with a merger (proximate causation) and the merger consideration was inadequate (economic loss), thereby making the Proxy an essential link in damaging stockholders. *Hot Topic*, 2014 U.S. Dist. LEXIS 180513, at *27-29 (citing *Mills* 396 U.S. at 384).

Here, Plaintiffs alleged that the intrinsic value of the Company was in excess of the "materially inadequate $10 per share being offered in the Buyout" (Compl. ¶¶ 65-67, 71), as evidenced by, among other facts; (i) Blount's sequential growth in 2015; (ii) management's own representations that Blount's financial performance was expected to improve; (iii) management's affirmance of 2015 earnings guidance; and (iv) that the earlier, more optimistic, September

Projections provided a more accurate view of the Company's prospects. (*Id.* at ¶¶ 11, 65-67, 72.)

Plaintiffs further alleged that the Proxy omitted the material and more optimistic September

Projections. (*Id.* at ¶¶ 55-72.) Nearly identical allegations have been found to be sufficient by

District Courts in the Ninth Circuit. Specifically, in *Hot Topic* the Court observed in relevant

part:

> Plaintiff's [loss causation] claims rest on its allegation that "the Merger
> Consideration was actually a discount to Hot Topic's enterprise value and intrinsic
> value." Plaintiff claims that analysts valued Hot Topic shares at $16.40 per share.
> Plaintiff also notes that because Hot Topic shares had a book value of $1.40 per
> common share, the purchase price was actually closer to $12.60 per share. When
> combined with Hot Topic's strong revenue growth and the 46% yearly increase in
> share price, Plaintiff argues that this information shows that the true value of Hot
> Topic's stock was greater than $14.00 per share, not less. Thus, because Plaintiff
> has sufficiently alleged that the Merger harmed the earning potential of its Hot
> Topic shares, Plaintiff has met the economic harm requirement.
>
> Plaintiff [also] alleges that the Proxy Statement makes a series of
> misrepresentations and omissions that misled shareholders into believing that
> $14.00 per share was a fair transaction. Plaintiff sufficiently connects the alleged
> misstatements and omissions in the Proxy Statement with its economic loss. Thus,
> Plaintiff's allegations satisfy the loss causation requirement.

2014 U.S. Dist. LEXIS 180513, at *27-29. (internal citations omitted); *See also*

*DaimlerChrysler*, 197 F. Supp. 2d at 66 ("allegations that the misrepresentations directly or

proximately caused, or were a substantial contributing cause of, the damages sustained by

plaintiff are adequate to plead causation.").

Just like the plaintiffs in *Hot Topic*, Plaintiffs have adequately pled loss causation by

alleging "that the Merger harmed the earning potential" of their shares, and "that the Proxy

Statement makes a series of misrepresentations and omissions that misled shareholders into

believing that [the Merger Consideration] was a fair transaction." *Id*. at *28-29. Thus, Plaintiffs

have, in fact, satisfied the "essential link" element of a § 14(a) claim.

**III.   Plaintiffs Have Adequately Alleged Claims Against the Individual Defendants Under § 20(a) of the Exchange Act**

"Section 20(a) claims are construed liberally and require only some indirect means of discipline or influence short of actual direction to hold a control person liable." *City of St. Clair Shores Gen. Emples. Ret. Sys. v. Inland W. Retail Real Estate Tr., Inc.*, 635 F. Supp. 2d 783, 795 (N.D. Ill. 2009). In addition, "[w]hether [the defendant] is a controlling person is an intensely factual question" generally reserved for the trier of fact. *Petrie v. Elec. Game Card, Inc.*, No. SA CV 10-0252-DOC (RNBx), 2015 U.S. Dist. LEXIS 14132, at *15 (C.D. Cal. Feb. 5, 2015). Accordingly, courts routinely conclude that where a plaintiff has adequately pled a Section 14(a) claim at the motion to dismiss stage, they have also successfully pled a Section 20(a) claim. *Inland W. Retail Real Estate* Supp. 2d 783 at 796; *Hot Topic*, 2014 U.S. Dist. LEXIS 180513, at *29-30 (same); *Brown v. Brewer* 2010 U.S. Dist. LEXIS 60863, at *23 (same). Here, Plaintiffs have adequately pled their Section 20(a) claim by alleging that the Individual Defendants had "positions of authority as officers and/or directors" and had the ability to control the issuance of the Proxy and could have prevented the wrongful conduct alleged. (Compl. ¶¶ 94-101.) Nothing more is required. *Id*.

<u>**CONCLUSION**</u>

Because materiality is a question of fact that should rarely be decided on a motion to dismiss, and a determination on materiality is inescapably intertwined with Plaintiffs' allegations of negligence, scienter, and causation, this case should be resolved by a jury. If the Court finds it appropriate to rule on materiality at this juncture, for the reasons set forth above, the omission of

the September Projections constitutes a material omission, and Plaintiffs have adequately pled

that Defendants violated Sections 14(a) and 20(a) of the Exchange Act.[8]

Respectfully submitted,

Dated: October 31, 2016                              **JOHNSON & WEAVER, LLP**


By:*/s W. Scott Holleman*
    W. Scott Holleman
    ScottH@johnsonandweaver.com
    99 Madison Avenue, 5th Floor
    New York, NY 10016
    Tel. (212) 802-1486

    **MCGAUGHEY ERICKSON**
    Robert J. McGaughey, OSB #800787
    bob@law7555.com
    1500 SW 1st Ave., Ste. 800
    Portland, OR 97201
    Tel. (503) 223-7555

    **LEVI & KORSINSKY LLP**
    Shannon L. Hopkins
    shopkins@zlk.com
    30 Broad Street, 24th Floor
    New York, NY 10004
    Tel. (212) 363-7500

    *Lead Counsel for Plaintiffs*

---

[8]    If the Court dismisses any aspect of the Amended Complaint, Plaintiffs respectfully request leave to amend. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires"); *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962) ( "leave should [be] granted to amend unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency").

## <u>CERTIFICATE OF SERVICE</u>

I, W. Scott Holleman, hereby certify that on October 31, 2016, I served the foregoing document via CM/ECF on all counsel of record.

Dated: October 31, 2016

*W. Scott Holleman*
W. Scott Holleman
