MCGAUGHEY ERICKSON
Robert J. McGaughey, OSB #800787
bob@law7555.com
Aurelia Erickson, OSB #126170
aurelia@law7555.com
Kevin Kress, OSB #146003
kevin@law7555.com
65 SW Yamhill Street, Suite 200
Portland, OR 97204
Tel. (503) 223-7555

*Liaison Counsel for Plaintiffs*

[Additional counsel listed on signature page.]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ELIA AZAR and DEAN ALFANGE, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>BLOUNT INTERNATIONAL, INC., JOSHUA L. COLLINS, DAVID A. WILLMOTT, ROBERT E. BEASLEY, JR., RONALD CAMI, ANDREW C. CLARKE, NELDA J. CONNORS, E. DANIEL JAMES, HAROLD E. LAYMAN, MAX L. LUKENS, and DANIEL J. OBRINGER,<br><br>     Defendants. | Case No. 3:16-CV-00483-SI<br><br><br>LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF: (i) CLASS ACTION SETTLEMENT; (ii) CLASS CERTIFICATION; (iii) PLAN OF ALLOCATION; AND (iv) APPLICATION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS<br><br>Date: September 9, 2019<br>Time: 10:00 a.m.<br>Courtroom 15B |

---

## TABLE OF CONTENTS

CERTIFICATION REGARDING COMPLIANCE WITH LR 7-1 ............................................. 1

MOTION ............................................................................................................................. 1

LEGAL MEMORANDUM ....................................................................................................... 2

I.     INTRODUCTION ....................................................................................... 2

II.    BACKGROUND ......................................................................................... 3

III.   ARGUMENT .............................................................................................. 3

      A.    The Court Should Approve the Settlement ..................................... 3

          1.    Lead Plaintiffs and Lead Counsel Are Adequately Representatives ................................................................. 5

          2.    The Settlement Was Negotiated at Arm's Length ......................... 6

          3.    The Settlement Provides Adequate Relief for the Class ................ 8

          4.    The Settlement Treats All Class Members Equitably ................. 15

          5.    The Reaction of Class Members Supports Settlement Approval ................................................................... 16

      B.    The Court Should Affirm Its Certification of The Class ......................... 17

          1.    The Class Is Numerous ................................................. 17

          2.    There Are Common Issues of Law and Fact ................................ 18

          3.    Lead Plaintiffs' Claims Are Typical of the Class ......................... 18

          4.    Lead Plaintiffs and Lead Counsel Are Adequate Representatives ................................................................. 19

          5.    The Class Meets the Requirements of Rule 23(b)(3) ................... 20

      C.    The Employed Notice Program Satisfies Due Process and Complies with Fed. R. Civ. P. 23(e) ......................................................... 20

      D.    The Court Should Approve the Plan of Allocation as Fair, Reasonable, and Adequate ........................................................................ 21

      E.    The Court Should Approve Lead Counsel's Application for Attorneys' Fees and Expenses ................................................................. 22

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

1.    The Requested Fee Should Be Awarded Based on a Percentage of the Recovery Obtained With a Lodestar Crosscheck ...................................................................... 23

2.    The Reasonableness of The Percentage Fee Requested Is Confirmed by the Analysis of the *Vizcaino* Factors ..................... 24

3.    The Reaction of the Class Supports the Fee Request ................... 31

4.    Lead Counsel's Lodestar Supports the Requested Fee Award .............................................................................................. 32

G.    The Court Should Include Lead Plaintiffs' Applications for Service Awards ............................................................................................. 34

IV.    CONCLUSION .................................................................................................. 35

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.F. v. Providence Health Plan,*
  300 F.R.D. 474 (D. Or. 2013) ............................................................... 5

*Adoma v. Univ. of Phoenix, Inc.,*
  913 F. Supp. 2d 964 (E.D. Cal. 2012) ................................................... 9

*Ahern v. Cent. Pac. Freight Lines,*
  846 F.2d 47 (9th Cir. 1988) .................................................................. 3

*Alfus v. Pyramid Tech. Corp.,*
  764 F. Supp. 598 (N.D. Cal. 1991) ..................................................... 18

*Amchem Prods. v. Windsor,*
  521 U.S. 591 (1997) ..................................................................... 17, 19

*Bellinghausen v. Tractor Supply Co.,*
  306 F.R.D. 245 (N.D. Cal. 2015) ........................................................ 16

*Blum v. Stenson,*
  465 U.S. 886 (1984) ........................................................................... 23

*Boeing Co. v. Van Gemert,*
  444 U.S. 472 (1980) ..................................................................... 22, 23

*Boyd v. Bank of Am. Corp.,*
  No. SACV 13-0561-DOC,
  2014 WL 6473804 (C.D. Cal. Nov. 18, 2014) .................................... 31

*Bravo v. Gale Triangle, Inc.,*
  No. 16-03347,
  2017 WL 708766 (C.D. Cal. Feb. 16, 2017) ...................................... 14

*Brotherton v. Cleveland,*
  141 F. Supp. 2d 907 (S.D. Ohio 2001) ............................................... 35

*Cent. R.R. & Banking Co. v. Pettus,*
  113 U.S. 116 (1885) ........................................................................... 23

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448 (2d Cir. 1974) ............................................................... 28

*City of Hialeah Emples. Ret. Sys. v. FEI Co.,*
  289 F. Supp. 3d 1162 (D. Or. 2018) ................................................... 12

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

*Class Plaintiffs v. Seattle,*
    955 F.2d 1268 (9th Cir. 1992) ........................................... 21

*Cook v. Niedert,*
    142 F.3d 1004 (7th Cir. 1998) .......................................... 35

*Deaver v. Compass Bank,*
    No. 13cv00222,
    2015 WL 8526982 (N.D. Cal. Dec. 11, 2015) ....................... 30

*Delta Air Lines, Inc. v. August,*
    450 U.S. 346 (1981) ....................................................... 3

*Demmings v. KKW Trucking, Inc.,*
    No. 3:14-cv-0494-SI,
    2018 U.S. Dist. LEXIS 159749 (D. Or. Sep. 19, 2018) ............ 20

*Eisen v. Porsche Cars N. Am. Inc.,*
    No. 2:11-cv-09405-CAS-FFMx,
    2014 U.S. Dist. LEXIS 14301 (C.D. Cal. Jan. 30, 2014) ........... 7

*Feller v. Transamerica Life Ins. Co.,*
    No. 16-cv-01378 CAS (GJSx),
    2019 U.S. Dist. LEXIS 19440 (C.D. Cal. Feb. 6, 2019) ........... 5

*Glickenhaus & Co. v. Household Int'l, Inc.,*
    787 F.3d 408 (7th Cir. 2015) ........................................... 13

*Grivas v. Metagenics, Inc.,*
    2019 WL 2005792 (C.D. Cal. May 6, 2019) ......................... 33

*Gunter v. Ridgewood Energy Corp.,*
    223 F.3d 190 (3d Cir. 2000) ............................................ 27

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1988) ............................. 5, 16, 18, 19

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) ........................................... 19

*Harris v. Marhoefer,*
    24 F.3d 16 (9th Cir. 1994) .............................................. 33

*Harris v. Vector Mktg. Corp.,*
    No. C-08-5198 EMC,
    2011 U.S. Dist. LEXIS 48878 (N.D. Cal. Apr. 29, 2011) ........... 6

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

*Hayes v. MagnaChip Semiconductor Corp.*,
   No. 14-cv-01160-JST,
   2016 U.S. Dist. LEXIS 177787 (N.D. Cal. Dec. 22, 2016) ..................................................... 17

*In BMC Software, Inc. S'holder Litig.*,
   C.A. No. 8544-VCG (Del. Ch. April 28, 2014) ........................................................ 25

*In re Activision Sec. Litig.*,
   723 F. Supp. 1373 (N.D. Cal. 1989) ....................................................................... 29

*In re Am. Bank Note Holographics*,
   127 F. Supp.2d 418 (S.D.N.Y. 2001) ...................................................................... 23

*In re Apollo Grp., Inc. Sec. Litig.*,
   No. CV 04-2147-PHX-JAT,
   2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) .......................................... 13

*In re Apple iPhone/iPod Warranty Litig.*,
   No. CV-10-01610,
   2014 U.S. Dist. LEXIS 64573 (N.D. Cal. May 8, 2014) ......................................... 13

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) ................................................................................. 26

*In re BankAtlantic Bancorp, Sec. Litig.*,
   No. 07-61542-CIV-UNGARO,
   2011 U.S. Dist. LEXIS 48057 (S.D. Fla. Apr. 25, 2011) ........................................ 13

*In re Blech Sec. Litig.*,
   No. 94-CV-7696 (RWS),
   2000 WL 661680 (S.D.N.Y. May 19, 2000) ........................................................... 33

*In re Cardizem CD Antitrust Litig.*,
   218 F.R.D. 508 (E.D. Mich. 2003) ......................................................................... 35

*In re Celera Corp. Sec. Litig.*,
   No. 5:10-CV-02604-EJD,
   2015 U.S. Dist. LEXIS 42228 (N.D. Cal. Mar. 31, 2015) ....................................... 21

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. 17-md-02777-EMC,
   2019 U.S. Dist. LEXIS 21990 (N.D. Cal. Feb. 11, 2019) ......................................... 5

*In re Dun & Broadstreet Credit Servs. Customer Litig.*,
   130 F.R.D. 366 (S.D. Ohio 1990) ........................................................................... 35

*In re El Paso Corp. S'holder Litig.*,
   C.A. No. 6949-CS (Del. Ch. Dec. 3, 2013) ............................................................ 25

v

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

*In re Equity Funding Corp. of Am. Sec. Litig.*,
   438 F. Supp. 1303 (C.D. Cal. 1977) ........................................................................ 27

*In re GSI Commerce, Inc. S'holder Litig.*,
   C.A. 6346-VCN (Del. Ch. Nov. 15, 2011) .............................................................. 25

*In re Heritage Bond Litig.*,
   No. 02-ML-1475 DT,
   2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) ........................... 11, 15, 29

*In re Heritage Bond Litig.*,
   No. 02-ML-1475 DT,
   2005 WL 1594403 (C.D. Cal. June 10, 2005) .............................................. passim

*In re Hot Topic, Inc. Sec. Litig.*,
   No. CV 13-02939 SJO (JCx),
   2014 U.S. Dist. LEXIS 155544 (C.D. Cal. Nov. 3, 2014).................................... 18

*In re Immune Response Sec. Litig.*,
   497 F. Supp. 2d 1166 (S.D. Cal. 2007)...................................................... 25, 31, 34

*In Re Laureate Education Inc. S'holder Litig.*,
   No. 24-C-07-000664 (Md. Cir. Ct. Baltimore Nov. 1, 2011)................................. 25

*In re Media Vision Tech. Sec. Litig.*,
   913 F.Supp. 1362 (N.D. Cal. 1996) ...................................................................... 33

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ........................................................................ 30, 35

*In re MyFord Touch Consumer Litig.*,
   No. 13-cv-03072-EMC,
   2019 U.S. Dist. LEXIS 53356 (N.D. Cal. Mar. 28, 2019)...................................... 5

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2007) ........................................................ passim

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ........................................................................ 15, 30

*In re Petroleum Prods. Antitrust Litig.*,
   109 F.3d 602 (9th Cir. 1997) .................................................................................. 32

*In re Relafen Antitrust Litig.*,
   231 F.R.D. 52 (D. Mass. 2005)............................................................................... 15

*In re Rite Aid Corp. Sec. Litig*,
   396 F.3d 294 (3d Cir. 2005)................................................................................... 31

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

*In re Sterling & Foster, Inc. Sec. Litig.*,
   238 F. Supp. 2d 480 (E.D.N.Y. 2002) ........................................................ 32

*In re Veeco Instruments Sec. Litig.*,
   No. 05 MDL 01695 (CM),
   2007 U.S. Dist. LEXIS 85554 (S.D.N.Y. Nov. 7, 2007) ........................... 29

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) ........................................................... 12

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ........................................................ 22, 26, 28

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007) ....................................................... 10

*In re Zynga Inc. Sec. Litig.*,
   No. 12-CV-04007-JSC,
   2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ............................................. 30

*Internal Imp. Fund Trustees v. Greenough*,
   105 U.S. 527 (1881) .................................................................................. 23

*Kirkorian v. Borelli*,
   695 F. Supp. 446 (N.D. Cal. 1988) .............................................................. 8

*Knight v. Red Door Salons, Inc.*,
   No. 08-01520 SC,
   2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ............................................... 26

*Liberte Capital Grp. v. Capwill*,
   No. 5:99 CV 818,
   2007 U.S. Dist. LEXIS 64869 (N.D. Ohio Aug. 29, 2007) ....................... 35

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,
   540 F.2d 102 (3d Cir. 1976) ...................................................................... 26

*Low v. Trump Univ., Ltd. Liab. Co.*,
   246 F. Supp. 3d 1295 (S.D. Cal. 2017) ....................................................... 7

*Maley v. Del Global Techs. Corp.*,
   186 F.Supp.2d 358 (S.D.N.Y. 2002) ......................................................... 23

*Mark v. Valley Ins. Co.*,
   No. CV 01-1575-BR,
   2005 WL 1334374 (D. Or. May 31, 2005) ............................................... 32

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

*Maywalt v. Parker & Parsley Petroleum Co.*,
   No. 92-1152 (RWS),
   1997 U.S. Dist. LEXIS 97 (S.D.N.Y. Jan. 6, 1997) ................................................ 22

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ................................................................................................ 24

*Nat'l Rural Telcomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ...................................................................... 7, 16

*O'Connor v. Uber Techs., Inc.*,
   No. 13-cv-03826-EMC,
   2019 U.S. Dist. LEXIS 54608 (N.D. Cal. Mar. 29, 2019) ....................................... 5

*Officers for Justice v. Civil Service Com.*,
   688 F.2d 615 (9th Cir. 1982) ........................................................................ 4, 5, 8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ..................................................................................... 10, 11

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ................................................................................. 18

*Paul, Johnson, Alston & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir. 1989) ........................................................................... 23, 30

*Petropoulous v. FCA US LLC*,
   No. 17cv0398,
   2019 WL 2289399 (S.D. Cal. May 29, 2019) ....................................................... 29

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ................................................................................................ 20

*Rodriguez v. W. Publishing*,
   563 F.3d 948 (9th Cir. 2009) ................................................................................... 6

*Singer v. Becton Dickinson & Co.*,
   No. 08-CV-821-IEG (BLM),
   2010 U.S. Dist. LEXIS 53416 (S.D. Cal. June 1, 2010) ....................................... 15

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) ......................................................................... 23, 30

*Spann v. J.C. Penney Corp.*,
   211 F. Supp. 3d 1244 (C.D. Cal. 2016) ............................................... 25, 26, 27, 28

*Stanger v. China Electric Motor, Inc.*,
   812 F.3d 734 (9th Cir. 2016) ................................................................................. 30

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

*Sudunagunta v. NantKwest, Inc.*,
   No. CV 16-1947-MWF (JEMx),
   2019 U.S. Dist. LEXIS 81337 (C.D. Cal. May 13, 2019) ...................... 10

*Tax Analysts v. I.R.S.*,
   No. CIV. A. 94-923 (GK),
   1999 WL 744169 (D.D.C. Sept. 3, 1999) .................................................. 34

*Tornabene v. Nw. Permanente, P.C.*,
   156 F. Supp. 3d 1234 (D. Or. 2015) ........................................................ 10

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ............................................................... 23, 30

*Trans World Airlines, Inc. v. Hughes*,
   312 F. Supp. 478 (S.D.N.Y. 1970) ........................................................... 27

*Vandervort v. Balboa Capital Corp.*,
   8 F. Supp. 3d 1200 (C.D. Cal. 2014) ...................................................... 31

*Virginia Bankshares v. Sandberg*,
   501 U.S. 1083 (1991) .................................................................... 10, 11

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) ..................................................................... 20

*West v. Circle K Stores, Inc.*,
   No. S-04-0438 WBS GGH,
   2006 U.S. Dist. LEXIS 76558 (E.D. Cal. Oct. 19, 2006) ........................ 24

*Wright v. Linkus Enterprises, Inc.*,
   259 F.R.D. 468 (E.D. Cal. 2009) ............................................................ 24

**Statutes**

15 U.S.C. § 78u-5(c)(1)(A)(i) .......................................................................... 12

15 U.S.C. § 77z-1(a)(6) .................................................................................. 23

**Rules**

Fed. R. Civ. P. 23 ............................................................................................ 17

Fed. R. Civ. P. 23(a) ..................................................................... 17, 18, 19, 20

Fed. R. Civ. P. 23(a)(1) .................................................................................. 17

Fed. R. Civ. P. 23(a)(2) .................................................................................. 17

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

Fed. R. Civ. P. 23(a)(3) ................................................................................................ 18

Fed. R. Civ. P. 23(e) ............................................................................................ passim

**Treatises**

*Manual for Complex Litigation* § 21.632 (4th ed. 2004) ............................................... 4

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS
CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

## <u>CERTIFICATION REGARDING COMPLIANCE WITH LR 7-1</u>

Pursuant to Local Rule 7-1, counsel for Lead Plaintiffs have conferred with Defendants regarding this Motion. Defendants have not reviewed this motion, including supporting memorandum and attachments, but do not oppose final approval of the Settlement, certification of the Class for settlement purposes only, and Defendants take no position on the plan of allocation or Lead Plaintiffs' application for attorneys' fees, reimbursement of expenses, and service awards.[1]

## <u>MOTION</u>

Lead Plaintiffs hereby move unopposed for the Court to enter the accompanying [Proposed] Order and Final Judgment (the "Final Approval Order"), which will:

(1)    Finally approve the terms of the Settlement as set forth in the Stipulation;

(2)    Finally certify the Class for settlement purposes;

(3)    Approve the Plan of Allocation of the Settlement Fund; and

(4)    Approve Lead Plaintiffs' application for an award of attorneys' fees, reimbursement of expenses, and service awards to each of Lead Plaintiffs.

In support of this Motion, Lead Plaintiffs rely upon the Legal Memorandum below, the Declaration of W. Scott Holleman ("Holleman Declaration"), and the previously filed Stipulation of Settlement, dated April 9, 2019.

---

[1]    All capitalized terms not defined herein have the same meanings set forth in the Stipulation of Settlement dated April 9, 2019, Dkt. No. 142 ("Stipulation").

<u>**LEGAL MEMORANDUM**</u>

## I.    INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs respectfully request that this Court grant final approval of the Settlement of this Action, wherein Lead Plaintiffs alleged that Defendants violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with the 2016 Acquisition of Blount by private equity funds American Securities and P2.

After extensive discovery and multiple mediations, the parties to this Action reached a settlement, embodied by the Stipulation, providing for a $3,059,000 Settlement Fund. On April 29, 2019, the Court signed an Order Preliminarily Approving Class Action Settlement and Notice Procedures; and Setting Final Approval Hearing (the "Preliminary Approval Order"), and set a hearing date for final approval of September 9, 2019. Beginning on May 13, 2019, 4,003 Notices setting forth the terms of the Settlement and Claims Forms were mailed to potential Class members and shareholders of record. Pursuant to the Preliminary Approval Order, the Summary Notice was published on *Investor's Business Daily* and *PR Newswire* on May 20, 2019. All of the relevant settlement papers, including the Notice and Proof of Claim form, have been available online at *www.blountinternationalsettlement.com*. The Claims Administrator has also established and maintained a telephone hotline to accommodate potential Class members with questions about the Settlement. To date, no Class members have objected to the Settlement and no Class members have excluded themselves.

The Settlement, which provides a meaningful recovery in the face of extraordinary risks of litigation, is fair, reasonable, adequate, and meets all of the relevant criteria for approval. Accordingly, Lead Plaintiffs respectfully submit that the Settlement and Plan of Allocation be

approved by this Court, the Settlement Class certified, and that the Court award Lead Counsel's attorneys' fees and expenses.

In connection with securing the common benefit of the settlement on behalf of the Class, lead Counsel respectfully requests an award of attorneys' fees in the amount of 33.3% of the Settlement Amount, plus reimbursement of litigation expenses that counsel reasonably and necessarily incurred in prosecuting and resolving the action. Lead Counsel also respectfully request that the Court approve service awards in the amount of $22,500 total to Lead Plaintiffs ($15,000 to Plaintiff Azar and $7,500 to Plaintiff Alfange) in recognition of the significant time and expense each made to secure the Settlement on behalf of the Class. As set out more fully herein, each of these requests is fair and reasonable, and comports with awards in similar complex securities class actions.

## II.    BACKGROUND

To avoid repetition, Lead Plaintiffs respectfully refer the Court to Lead Plaintiffs' Motion for Preliminary Approval (Doc. 144) and the Holleman Declaration filed herewith for a detailed discussion of the factual background and procedural history of the Litigation, the efforts undertaken by Lead Plaintiffs and Lead Counsel during the course of the Litigation, the risks of continued litigation, and a discussion of the negotiations leading to the Settlement.

## III.    ARGUMENT

### A.    The Court Should Approve the Settlement

Public policy strongly favors settlements as a means of resolving litigation. *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 363 (1981) (explaining that "parties to litigation and the public as a whole have an interest—often an overriding one—in settlement rather than exhaustion of protracted court proceedings"); *Ahern v. Cent. Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir. 1988)

---

(internal citations and quotation marks omitted) ("It is well recognized that settlement agreements are judicially favored as a matter of sound public policy."). "This is especially true in complex class action litigation . . . ." *Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983).

The Federal Rules of Civil Procedure require judicial approval of proposed class action settlements. *See* Fed. R. Civ. P. 23(e). Settlement approval is a two-step process: (i) preliminary approval, followed by notice to the class, and (ii) final approval. *Manual for Complex Litigation* § 21.632, at 320 (4th ed. 2004). On April 29, 2019, the Court granted preliminary approval of the Settlement (Doc. 146), and Plaintiffs now seek final approval of the Settlement.

Under Rule 23(e)(2), the Court should evaluate whether the Settlement is "fair, reasonable, and adequate," which requires consideration of several factors, including whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided by the settlement is adequate, . . . and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). Sub-parts (A) and (B) focus on "'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement," while sub-parts (C) and (D) implicate a "'substantive' review of the terms of the proposed settlement." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.[2]

---

[2]   The Advisory Committee's notes acknowledge that "Courts have generated lists of factors" to assess whether a settlement is fair, reasonable, and adequate, and "[t]he goal of [the 2018] amendment is not to displace any factor." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. For instance, the Ninth Circuit has traditionally considered the following factors:

> [1] [T]he strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status

The court's inquiry is limited "to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2007) (citing *Officers*, 688 F.2d at 615). Indeed:

> [The] fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.

*Officers,* 688 F.2d at 625 (citations omitted).

## 1. Lead Plaintiffs and Lead Counsel Are Adequately Representatives

The adequacy requirement turns on two questions: "(1) whether the named plaintiffs and their counsel have any conflicts of interest with other class member; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class." *A.F. v. Providence Health Plan*, 300 F.R.D. 474, 482 (D. Or. 2013) (internal quotation marks omitted) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1988)).

Here, neither Lead Plaintiffs nor Lead Counsel have any conflict of interest with any other Class members. Lead Plaintiffs' interests were aligned with the Class members because, as Blount stockholders, they all suffered the same type of alleged injury. Lead Counsel similarly has no

---

throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

*Officers*, 688 F.2d at 625. That said, the amendment was designed "to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.*

---

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS CERTIFICATION, PLAN OF ALLOCATION, AND FEE AND EXPENSE AWARDS

5

conflict of interest.

Moreover, Lead Plaintiffs and Lead Counsel vigorously prosecuted this Action. Lead Plaintiffs communicated frequently and met with Lead Counsel several times to discuss the status of the Action and potential litigation and settlement strategies, participated in written and document discovery, and sat for depositions (Mr. Azar in Los Angeles and Mr. Alfange in New York). Further, Lead Counsel, highly experienced in litigating complex class actions, conducted an extensive pre-suit investigation, filed suit and engaged in motion practice before the Transaction closed, filed an amended complaint and defeated Defendants' Motion to Dismiss after the Transaction closed, engaged in extensive discovery (which included interrogatories, requests for admission, document requests, third-party subpoenas, reviewed of hundreds of thousands of pages of documents, and 19 depositions across the country), and participated in multiple mediations and related settlement discussions.

Based on the lack of conflict and vigorous prosecution, adequacy is satisfied here.

### 2.    The Settlement Was Negotiated at Arm's Length

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 U.S. Dist. LEXIS 48878, at *24 (N.D. Cal. Apr. 29, 2011) (citation omitted); *see also Rodriguez v. W. Publishing*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."). Indeed, "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. . . . Thus, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Nat'l Rural Telcomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (citations omitted).

The Settlement was fairly and honestly negotiated by qualified, experienced counsel on both sides, who at all times considered the best interests of the Parties and the Settlement Class. Lead Counsel are accomplished plaintiff's securities class action firms with significant experience in securities and other complex class actions throughout the country. Liaison Counsel is also highly experienced in complex litigation. (Firm Resumes, attached as Exhibit A to each of the Holleman Fee Declaration, Hopkins Declaration, and McGaughey Declaration, annexed hereto as Exhibits 4, 5, and 6, respectively.)

In addition, the Settlement was achieved with the aid of a well-respected independent third-party mediator, David Geronemus. *See, e.g.*, *Eisen v. Porsche Cars N. Am. Inc.*, No. 2:11-cv-09405-CAS-FFMx, 2014 U.S. Dist. LEXIS 14301, at *14 (C.D. Cal. Jan. 30, 2014) ("[W]here the services of a private mediator are engaged, this fact tends to support a finding that the settlement valuation by the parties was not collusive."). The parties engaged in negotiations during two separate in-person mediations and several telephonic conversations with the mediator. The negotiations were in good faith and were in no way collusive. After nearly three years of vigorous litigation, two separate full days of mediation, and close to a year of spirited discussion and back and forth bargaining, the Parties agreed to settle this Action for $3,059,000.

As set forth herein and in the accompanying Holleman Declaration, Lead Counsel has vigorously prosecuted this Action against Defendants for over three years, has become intimately familiar with the facts underlying the case and is knowledgeable of all the circumstances at issue in this Action. After a thorough and careful evaluation of the merits of Lead Plaintiffs' claims, Defendants' defenses, and the risks, expense and uncertainties inherent in further expansive discovery and continued prosecution, Lead Plaintiffs and Lead Counsel determined that the $3,059,000 cash settlement was a fair resolution of this Litigation. (Holleman Decl. ¶¶ 11, 28-37,

72.) *See Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) ("The recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement.").

Under these circumstances, it is clear that the Settlement is not the result of fraud, collusion, or abandonment of the interests of the Class, but rather is the result of extensive and informed arm's-length negotiations.

### 3.    The Settlement Provides Adequate Relief for the Class

The present Settlement provides an immediate and substantial cash benefit to the Class in the amount of $3,059,000, which is an outstanding result and falls well within a range of what would be fair, reasonable, and adequate given the relevant considerations. In making the adequacy determination, the Court considers the following factors:

(i)    the costs, risks, and delay of trial and appeal;

(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3);

Fed. R. Civ. P. 23(e)(2)(C). An evaluation of the benefits of settlement must also be tempered by a recognition that any compromise involves concessions on the part of all the settling parties. Indeed, "the very essence of a settlement is compromise." *Officers*, 688 F.2d at 624.

### i.    Costs, Risks, and Delay of Trial and Appeal

In connection with the first factor—"costs, risks, and delay of trial and appeal"—the Court considers as a threshold matter whether there was sufficient discovery to permit an informed decision on whether to settle the Action on the proposed terms. *Cf. Adoma v. Univ. of Phoenix,*

*Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) ("A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case."). Here, before filing suit and before filing their Amended Complaint, Lead Counsel conducted a thorough investigation, which included a review of Defendants' public documents, conference calls, earnings and other announcements, SEC filings, press releases issued by and regarding Blount, analysts' reports regarding Blount, and other information obtainable on the Internet.

During discovery, Lead Counsel obtained, reviewed, and analyzed hundreds of thousands of pages of documents produced by Defendants and third parties. Lead Counsel also took 19 depositions, including of Blount's entire Board, various senior executives at Blount involved in the preparation of Blount's financial projections, representatives of Blount's two financial advisors, and representatives of Blount's acquirers, American Securities and P2. Moreover, although the Action settled before expert reports were due, Lead Counsel also consulted extensively with a financial expert. Lead Plaintiffs also responded to discovery propounded by Defendants. Lead Plaintiffs' pre-suit investigation and the expansive discovery record informed the Settling Parties of the strengths and potential weaknesses of their claims and defenses.

As to the merits, Lead Plaintiffs asserted claims under Section 14(a) of the Exchange Act arising out of the Transaction, alleging that the Proxy Statement misrepresented and omitted material information by, among other things, (i) omitting the more accurate September Projections and (ii) disclosing the misleading November Projections and December Projections. (Am. Compl. ¶¶ 55-72.) Lead Plaintiffs further alleged that, as a result of Defendants' alleged misconduct, Lead Plaintiffs and all other Class Members were damaged in that Blount was worth materially more than the $10 per share offered in the Transaction. Lead Plaintiffs and Lead Counsel believe their

claims are meritorious, but continued litigation through trial, and likely appeals, posed significant risks that made any recovery uncertain. *See Sudunagunta v. NantKwest, Inc.*, No. CV 16-1947-MWF (JEMx), 2019 U.S. Dist. LEXIS 81337, at *13 (C.D. Cal. May 13, 2019) (costs and risks associated with "further deposition and expert discovery, motion practice and trial, and potentially appeals" weighed in favor of final approval of settlement).

To prevail at trial, Lead Plaintiffs would have had to demonstrate: "(1) defendants made a material misrepresentation or omission in a proxy statement; (2) with the requisite state of mind; and (3) that the proxy statement was the transactional cause of harm of which plaintiff complains." *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015 (N.D. Cal. 2007) (citing *Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 384 (1970)). Moreover, although never raised in the Motion to Dismiss, Lead Plaintiffs expect that Defendants would have argued that Lead Plaintiffs cannot prove objective falsity (*i.e.*, that the statements in the Proxy Statement regarding Blount's prospects were, in fact, objectively false) and subjective falsity (*i.e.*, that Defendants themselves believed such statements were false), as arguably required by *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991), and *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015). And at summary judgment, Lead Plaintiffs would have had to demonstrate that there was a "genuine dispute as to any material fact" with respect to their claims against Defendants and any defenses Defendants have asserted. *Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1237 (D. Or. 2015) (Simon, J.) (citations omitted) (discussing the standard of adjudication for summary judgment motions).

Lead Plaintiffs believe that some evidence obtained during discovery supports their claims that the September Projections more accurately reflected Blount's short- and long-term prospects and, thus, were material and should have been disclosed to Blount's stockholders. Lead Plaintiffs

also believe that some evidence obtained during discovery supports their claims that the November and December Projections summarized in the Proxy Statement did not accurately reflect Blount's prospects as of when the Board agreed to the Transaction and, therefore, that the inclusion of the November and December Projections in the Proxy Statement rendered the Proxy Statement materially misleading. Lead Plaintiffs also believe the they would have a credible chance of demonstrating liability, but success is far from guaranteed. *See generally In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 U.S. Dist. LEXIS 13555, at *25 (C.D. Cal. June 10, 2005) (citation omitted) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced").

Defendants deny that they engaged in any wrongdoing whatsoever. As a purely factual matter, Defendants dispute Lead Plaintiffs' allegations that the September Projections more accurately represented Blount's business prospects than the November and December Projections, likely relying on foreign exchange rate volatility, concerns with Blount's competitors, loss of business with key customers, and a generally pessimistic outlook for Blount's industry. Accordingly, Defendants contend that the failure to disclose the September Projections was not a material omission and that the inclusion of the November and December Projections was not in any way materially misleading. In addition to disputing the materiality issues regarding the September, November, and December Projections, Defendants deny that Lead Plaintiffs can establish any other elements required for liability (*i.e.*, negligence and loss causation). (Defs. Ans. ¶¶ 89-93, Affirmative Defenses 4, 5.) Defendants would also argue that Lead Plaintiffs would be unable, under *Virginia Bankshares* and *Omnicare*, to demonstrate objective falsity and subjective falsity with respect to the accuracy of the September Projections and the concomitant inaccuracy of the November and December Projections.

In addition to the high burden Lead Plaintiffs have of establishing liability and damages, Defendants might also assert defenses related to the notion that any projections-related representations are "forward looking statements" protected by the PSLRA's "safe harbor" provision. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) (shielding defendants from liability where "forward-looking statements" are identified as such and accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement"). Lead Plaintiffs contend that the PSLRA's safe-harbor provision was not designed to immunize the type of misconduct Lead Plaintiffs alleged, yet the risk of defeat is real. *See, e.g., City of Hialeah Emples. Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1172 (D. Or. 2018) (Simon, J.) ("The safe harbor provision of 15 U.S.C. § 78u-5 therefore applies to the Board's expression of its belief that the Higher Projections were a less likely outcome than the Lower Projections, to the extent that such an expression was a forward-looking statement.").

Even if Lead Plaintiffs established liability, they would still face an uphill battle of demonstrating damages resulting from any misconduct. Determining the amount of damages would have required complicated expert testimony and use of methodologies that are debated among economists. Defendants would have presented their own experts to demonstrate that the alleged valuation employed in the transaction was fair and well-reasoned. This would create a "'battle of experts,' [in which] it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985), aff'd 798 F.2d 35 (2d Cir. 1986). Although Lead Plaintiffs have adequate grounds to argue that the Class was damaged because Blount was worth more than the $10 per share offered in the Transaction,

Defendants have consistently denied that Blount stockholders have sustained any damages as a result of any alleged misconduct given the premium paid over the then-current trading price for Blount stock, the state of Blount's business, the state of the industry in which Blount participated, and the process relied on by the Board leading up to the Transaction.

Finally, even if Lead Plaintiffs prevailed on the inevitable motions for summary judgment, and then prevailed even at trial, substantial risk would remain through a likely appeal. Indeed, even very large judgments, awarded after lengthy litigation and trial, can be reversed on appeal.[3] Any further proceedings would also be extraordinarily costly. The Settling Parties have already spent a considerable amount of time and resources through fact discovery, but the cost of expert discovery, summary judgment, and trial would multiply that investment. *See, e.g.*, *In re Apple iPhone/iPod Warranty Litig.*, No. CV-10-01610, 2014 U.S. Dist. LEXIS 64573, at *7 (N.D. Cal. May 8, 2014) ("In addition, further litigation would have been costly and time-consuming. Although Plaintiffs had already conducted substantial research and discovery, significant additional discovery— including expert discovery—would have been necessary, Plaintiffs would have had to obtain certification of a class, and both sides would have faced *Daubert* challenges to their experts, before

---

[3]    Indeed, in *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, No. 02-C-5893 (N.D. Ill.), the jury returned a verdict in plaintiff's favor on Section 10(b) liability after seven years of hard-fought litigation. *Six years later*, the Seventh Circuit reversed and remanded, holding that "the defendants are entitled to a new trial limited to the two issues we've identified here: loss causation and whether the three executives 'made' certain of the false statements under *Janus's* narrow definition of that term." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 433 (7th Cir. 2015). *See also In re Apollo Grp., Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (overturning a jury verdict in plaintiffs' favor on loss causation grounds), *rev'd and remanded on other grounds*, 2010 U.S. App. LEXIS 14478 (9th Cir. 2010); *In re BankAtlantic Bancorp, Sec. Litig.*, No. 07-61542-CIV-UNGARO, 2011 U.S. Dist. LEXIS 48057 (S.D. Fla. Apr. 25, 2011) (court granted defendants' judgment as a matter of law on the basis of loss causation, overturning jury verdict and award in plaintiff's favor), *aff'd sub nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012).

---

Plaintiffs' claims would be permitted to proceed to trial.").

Accordingly, based on Lead Counsel's view of the value of an immediate cash benefit to the Class, the merits of their claims, and the expense involved in further litigation, Lead Plaintiffs and Lead Counsel believe the Settlement offers an excellent result. *See In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 WL 1594403, at *8 (C.D. Cal. June 10, 2005) ("much of the value of a settlement lies in the ability to make funds available promptly."); *Bravo v. Gale Triangle, Inc.*, No. 16-03347, 2017 WL 708766, at *9 (C.D. Cal. Feb. 16, 2017) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."). Thus, where "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court," the recovery of a substantial sum certain today, weighs in favor of the Settlement. *OmniVision,* 559 F. Supp. 2d at 1042 ("[T]he Settlement, which offers an immediate and certain award for a large number of potential class members, appears a much better option").

### ii.   The Proposed Method of Distributing Relief Is Effective

With respect to Rule 23(e)(2)(C)(ii), the notice plan includes direct mail notice to all those who could be identified with reasonable effort supplemented by the publication of the Summary Notice in *Investor's Business Daily* and over the *Business Wire*. In addition, a settlement-specific website has been created and maintained where key documents related to the Settlement have been posted.

### iii.   Attorneys' Fees

Lead Counsel requests an award of 33.3% of the Settlement Fund in reasonable attorneys' fees, as well as reimbursement of $317,922.40 (less than the $400,000 contained in the Notice) in out-of-pocket expenses they incurred. As explained below in Section III.E, this request is in line

with numerous other settlements. *See, e.g.*, *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (approving an attorneys' fee award of 33% of settlement fund); *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG (BLM), 2010 U.S. Dist. LEXIS 53416, at *23 (S.D. Cal. June 1, 2010) (approving an attorneys' fee award of 33.33%); *Heritage Bond*, 2005 U.S. Dist. LEXIS 13555, at *74 (awarding fees of 33.3% of settlement fund, plus expenses); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 80-82 (D. Mass. 2005) (awarding 33.3% of settlement).

### iv.    The Settling Parties Have No Side Agreements

Rule 23(e)(2)(C)(iv) requires the disclosure of any side agreement. There are no agreements pertaining to the Settlement other than the Stipulation itself.

### 4.    The Settlement Treats All Class Members Equitably

Rule 23(e)(2)(D) looks at whether Class Members are treated equitably. Here, the method for distributing the Net Settlement Fund to the Class is simple and equitable. To obtain a payment, a Class Member must submit a Proof of Claim with his name, contact information, number of shares of Blount stock owned on the applicable dates, and other information pertinent to the ownership of Blount stock. The Class Members will all be treated equitably relative to each other because each Authorized Claim shall receive his, her, or its *pro rata* share of the Net Settlement Fund based on their recognized losses, which flows directly from the number of shares of Blount common stock held continuously from March 4, 2016, the record date for voting on the Transaction, through April 12, 2016, when the Transaction was completed.

*        *        *

Each factor identified under Rule 23(e)(2), including the procedural fairness and substantive adequacy of the $3,059,000 million recovery is satisfied. Lead Plaintiffs and Lead Counsel obtained this recovery in the absence of parallel governmental actions. Given the litigation

risks involved, the complexity of the underlying issues and the skill of defense counsel, the Settlement is an excellent result. It could not have been achieved without full commitment by Lead Plaintiffs and Lead Counsel. Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is both fair and adequate and that it meets each of the Rule 23(e)(2) factors such that notice of the Settlement should be sent to the Class.

### 5. The Reaction of Class Members Supports Settlement Approval

The reaction of the class to a settlement is a significant factor in assessing its fairness and adequacy. Indeed, "it is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement are favorable to the class members." *Nat'l Rural Telcomms. Coop.*, 221 F.R.D. at 529. "Thus, here, the Court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 258 (N.D. Cal. 2015) (no class members had objected, and only nine excluded themselves).

Pursuant to the Court's Preliminary Approval Order, over 4,003 Notice Packets were sent to potential Settlement Class Members, and Summary Notices were distributed over various business news wires on two separate occasions. Declaration of Matthew Mulvihill Regarding Mailing of the Notice and Proof of Claim Form ("Mulvihill Decl.") ¶3 (attached as Holleman Decl. Ex. 2); Certification of Kathleen Komraus Regarding Confirmation of Publication ("Komraus Cert.") (attached as Holleman Decl. Ex. 3). The reaction of the Class to the Settlement was completely favorable. While the deadline for Settlement Class Members to exclude themselves from the Settlement Class or object to the Settlement, the Plan of Allocation and the application for attorneys' fees and reimbursement of litigation expenses is on August 19, 2019, as of the filing of this Motion (July 25, 2019), there are no objections and no exclusions. (Holleman Decl. ¶ 43.)

The fact that there have been no objections raises a strong presumption that the settlement is favorable to the class. *See Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."). Accordingly, Class Members' reaction to the Settlement strongly warrants approval.

## B.     The Court Should Affirm Its Certification of The Class

One of the Court's functions in reviewing a proposed settlement of a class action is to determine whether the action may be maintained as a class action under Rule 23(e)(1)(B)(ii). *See Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). Rule 23(a) establishes four prerequisites to class certification: (i) "numerosity," (ii) "commonality," (iii) "typicality," and (iv) "adequacy" of representation. *See id*. at 613. In addition, the Class must meet one of the three requirements of Rule 23(b). *See* Fed. R. Civ. P. 23. In the Court's Preliminary Approval Order, the Court preliminarily certified a settlement class consisting of "all persons who held Blount common stock continuously from March 4, 2016, the record date for voting on the Transaction, through April 12, 2016, when the Transaction was completed." (Doc. No. 146 at ¶ 2.) As set forth in the Lead Plaintiffs' motion for preliminary approval and below, the Class satisfies Rule 23's requirements.

### 1.     The Class Is Numerous

The numerosity requirement under Rule 23(a)(1) is satisfied where, as here, the proposed class is so numerous that joinder of all class members is impracticable. During the period relevant to the Class, Blount had more than 48 million shares of common stock outstanding, such that there were undoubtedly hundreds, if not thousands, of holders of Blount shares. A class of this size is so numerous as to make individual joinder impracticable, if not logistically impossible, especially where members of the class are located throughout the country. The proposed class satisfies the

numerosity requirement of Rule 23(a). *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 U.S. Dist. LEXIS 177787, at *10 (N.D. Cal. Dec. 22, 2016) (numerosity met with a range of approximately 34.1 million to 37.1 million shares outstanding).

### 2.     There Are Common Issues of Law and Fact

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This commonality requirement is "construed permissively," and "all questions of fact and law need not be common to satisfy the [R]ule." *Hanlon*, 150 F.3d at 1019. "'Commonality is easily met in cases where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties,' even if damages vary." *In re Hot Topic, Inc. Sec. Litig.*, No. CV 13-02939 SJO (JCx), 2014 U.S. Dist. LEXIS 155544, at *12 (C.D. Cal. Nov. 3, 2014) (quoting *In re Verisign, Inc. Sec. Litig.*, C No. 02-02270 JW, 2005 U.S. Dist. LEXIS 10438, at *17 (N.D. Cal. Jan. 13, 2005)).

The common questions of fact and law here include: (i) whether Defendants violated the federal securities laws; (ii) whether Defendants misstated and/or omitted to state material facts in public statements and filings with the SEC; (iii) whether Defendants participated directly or indirectly in the course of misconduct; and (iv) the extent of damage sustained by Settlement Class Members, and the appropriate measure of damages. These questions are sufficient to establish commonality. *See id.* (finding commonality based on common questions similar to the common questions in this case).

### 3.     Lead Plaintiffs' Claims Are Typical of the Class

"Rule 23(a)(3) requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.' 'Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they

---

need not be substantially identical.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014), (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Differences in the amount of damage, the size or manner of purchase, the nature of the purchaser, and the date of purchase are insufficient to defeat class certification. *See Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991).

Here, Lead Plaintiffs' claims arise from the same events or course of conduct that give rise to claims of other members of the Settlement Class, and the claims asserted are based on the same legal theories. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (explaining that the test for typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct"). Indeed, this case satisfies the typicality requirement because the claims of all members of the Settlement Class derive from the same legal theories and allege the same set of operative facts. Lead Plaintiffs, like the other members of the Settlement Class, held Blount shares in the same manner. Further, Lead Plaintiffs are not subject to any unique defenses that could make them atypical of members of the Settlement Class. Therefore, Lead Plaintiffs' claims are typical.

### 4.    Lead Plaintiffs and Lead Counsel Are Adequate Representatives

To "fairly and adequately protect the interests of the class" under Fed. R. Civ. P. 23(a)(4), named plaintiffs and their counsel may not "have any conflicts of interest with other class members" and must "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020. As explained above in Section III.A.1, *supra*, both criteria are met here. Neither Lead Plaintiffs nor Lead Counsel have any conflicts, and Lead Plaintiffs and Lead Counsel have vigorously prosecuted this Action for over three years.

### 5.    The Class Meets the Requirements of Rule 23(b)(3)

In addition to satisfying all of the criteria of Rule 23(a), a party seeking class certification must also satisfy one of the requirements of Rule 23(b). Certification of a class under Rule 23(b)(3) requires that (i) common issues predominate over individual issues and (ii) the class action mechanism is superior to other methods of adjudicating the controversy. Both of these requirements are satisfied here.

The predominance inquiry focuses on the existence of common issues. As the Supreme Court recognized in *Amchem*, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." 521 U.S. at 625. Further, resolution of this case through a class action is far superior to litigating thousands of individual claims where the expense for a single investor in pursuing a separate action could exceed the individual's loss. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class action device permits pooling of claims where it would be uneconomical to litigate individually). In sum, the Class meets all of the requirements of Rules 23(a) and (b)(3) and should be certified in conjunction with the Settlement.

### C.    The Employed Notice Program Satisfies Due Process and Complies with Fed. R. Civ. P. 23(e)

Under Federal Rule of Civil Procedure 23(e)(1), "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal" (*i.e.*, the proposed settlement). Due process also requires that the class members be given notice of a proposed settlement and their right to be heard at the fairness hearing. "There are no rigid rules to determine whether a settlement notice to the class satisfices constitutional or Rule 23(e) requirements." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). Rather, a class notice is sufficient if it "generally describe the terms of the settlement in sufficient detail to alert those with

adverse viewpoints to investigate and to come forward and be heard." *Demmings v. KKW Trucking, Inc.*, No. 3:14-cv-0494-SI, 2018 U.S. Dist. LEXIS 159749, at *8-9 (D. Or. Sep. 19, 2018) (quoting *Lane v. Facebook, Inc*., 696 F.3d 811, 826 (9th Cir. 2012) (internal quotation marks omitted).

The Court found in its Preliminary Approval Order that the proposed Notice, including the form thereof, set forth in the Stipulation meets the requirements of due process and Rule 23. Pursuant to the Preliminary Approval Order, the parties Claims Administrator sent out 4,003 notices to potential class members. Mulvihill Decl. ¶3. The Notice was also published in *Investor's Business Daily* and over *PR Newswire*, as well as posted online at www.blountinternationalsettlement.com. *See* Holleman Decl. ¶¶ 41-42; Komraus Cert. at 1-5. These methods of giving notice (similar, if not identical, to the methods used in countless other securities class actions) have also been "found to be satisfactory and meet[] due process." *In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2015 U.S. Dist. LEXIS 42228, at *18-19 (N.D. Cal. Mar. 31, 2015).

### D.    The Court Should Approve the Plan of Allocation as Fair, Reasonable, and Adequate

Lead Plaintiffs also ask the Court to grant final approval of the Plan of Allocation of the Net Settlement Proceeds. The Plan of Allocation was described in detail in the Notice that was sent to Settlement Class members. The evaluation of a plan of allocation among class members, like the settlement itself, is based upon whether the plan of allocation is fair, reasonable, and adequate. *See Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1284-85 (9th Cir. 1992). The Court has broad discretion in approving the Plan. *Id*. at 1284.

The final Plan of Allocation should be approved because it provides a fair basis upon which to distribute the Net Settlement Fund among Settlement Class members who submit valid proof of

claim forms. Specifically, monies will be distributed from the Net Settlement Fund (*i.e.*, $3,059,000 less allowed legal fees and expenses as approved by the Court) to every Settlement Class member who submits an acceptable Claim Form when their distribution will be $10.00 or more. Any remaining funds after the first distribution will be redistributed to those Class Members who cashed their first distribution check, after deduction of any unpaid costs or fees in administering the Net Settlement Fund for such redistribution, if the second distribution would be more than $10.00 for each such Class Member. This will be repeated until the balance of the Net Settlement Fund is *de minimis*. Any remaining funds at that point will be contributed to a non-sectarian not-for-profit organization designated by Lead Counsel and approved by the Court. This Plan was set forth in the Notice mailed to Class members and there have been no objections. *See Maywalt v. Parker & Parsley Petroleum Co.*, No. 92-1152 (RWS), 1997 U.S. Dist. LEXIS 97, at *11-12 (S.D.N.Y. Jan. 6, 1997) (stating that lack of objections to plan of allocation is an important factor in evaluating the plan), *aff'd*, 145 F.3d 513 (2d Cir. 1998).

E.    **The Court Should Approve Lead Counsel's Application for Attorneys' Fees and Expenses**

It has long been recognized that a person who maintains a suit that results in the creation of a fund in which others have a common interest may obtain fees from that common fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a coBlounmmon fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"). The Ninth Circuit has specifically found that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994). *See also Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977) ("a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a

claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees"). The common fund doctrine is also designed to prevent the unjust enrichment of class members who benefit from a lawsuit without paying for it. *Boeing*, 444 U.S. at 478. As explained below, the requested fee amount is reasonable considering the relevant factors in the Ninth Circuit and a lodestar cross-check.

### 1.    The Requested Fee Should Be Awarded Based on a Percentage of the Recovery Obtained With a Lodestar Crosscheck

For their efforts in creating a common fund for the benefit of the Class, Lead Counsel seek a fee of 33.3% of the Settlement Fund, or $1,018,647.00 based on the $3,059,000 Settlement Fund. Both Supreme Court and Ninth Circuit precedent supports Lead Plaintiffs' request for a percentage of the Settlement Fund.

The Supreme Court has consistently held that where a common fund has been created for the benefit of a class as a result of counsel's efforts, the award of counsel's fee should be determined on a percentage of the fund basis. *See, e.g.*, *Internal Imp. Fund Trustees v. Greenough*, 105 U.S. 527, 532 (1881); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-125 (1885); *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 166-67 (1939); *Boeing*, 444 U.S. at 478-79. Indeed, by 1984 this notion was so well established that the Supreme Court needed no more than a footnote to make this point in *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on class. . . ."). The Ninth Circuit also favors the percentage-of recovery method in common fund cases. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 268 (9th Cir. 1989).

In employing the percentage-of-recovery method, courts may perform a lodestar cross-check on the reasonableness of the requested fee. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (affirming use of percentage method to calculate attorneys' fees and

application of lodestar method as cross-check); *West v. Circle K Stores, Inc*., No. S-04-0438 WBS GGH, 2006 U.S. Dist. LEXIS 76558, at *21-22 (E.D. Cal. Oct. 19, 2006) (applying percentage method with lodestar cross-check).

No matter which method is chosen—the percentage method or the lodestar method—the fees awarded in common fund cases must be fair and reasonable under the circumstances of a particular case. *Missouri v. Jenkins,* 491 U.S. 274, 285 (1989) (recognizing that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace); *Wright v. Linkus Enterprises, Inc.*, 259 F.R.D. 468, 476 (E.D. Cal. 2009) (fee should be "reasonable under the circumstances") (emphasis omitted).

## 2.    The Reasonableness of The Percentage Fee Requested Is Confirmed by the Analysis of the *Vizcaino* Factors

Plaintiffs' request for 33.3% of the Settlement Fund is within the range of attorneys' fees awarded by federal courts in similar circumstances and is within the range of fees awarded by judges in this District. The Ninth Circuit has recognized that in determining the appropriate percentage of attorneys' fees in common fund cases, the court should be informed by an analysis of the factors articulated by the Ninth Circuit in *Vizcaino v. Microsoft Corp*., 290 F.3d 1043 (9th Cir. 2002). These factors are commonly referred to as the *Vizcaino* factors and include: (1) the results for the class; (2) the risks for its counsel; (3) whether the fee is within the range typically associated with cases of this kind; (4) the burden on plaintiffs' counsel of prosecuting the case, and (5) the difficulty of the questions presented. *See Vizcaino*, 290 F.3d at 1048-50. An analysis of the *Vizcaino* factors supports approval of Lead Counsel's fee request.

### i.    The Results Achieved

Courts have recognized that the result achieved is an important factor to be considered in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (stating that the "most critical

factor is the degree of success obtained"); *Vizcaino*, 290 F.3d at 1048; *Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1263 (C.D. Cal. 2016). Here, a Settlement fund of $3,059,000 has been obtained through the diligent efforts of Lead Counsel without the necessity and risk of prolonged litigation, trial, and appeals. The settlement represents approximately 0.357% of the total value of the Transaction of approximately $855 million. As a percentage of total deal value, this Settlement is consistent with monetary settlements in similar litigation. *See, e.g., In BMC Software, Inc. S'holder Litig.*, C.A. No. 8544-VCG (Del. Ch. April 28, 2014) (approving $12.4 million settlement on behalf of class in transaction valued at $6.9 billion, or a 0.18% increase in the merger consideration); *In re El Paso Corp. S'holder Litig.*, C.A. No. 6949-CS (Del. Ch. Dec. 3, 2013) (approving $110 million settlement on behalf of class in transaction valued at $21 billion, or a 0.52% increase in the merger consideration); *In Re Laureate Education Inc. S'holder Litig.*, No. 24-C-07-000664 (Md. Cir. Ct. Baltimore Nov. 1, 2011) (approving $35 million settlement in transaction valued at $3.8 billion, or a 0.92% increase in the merger consideration); *In re GSI Commerce, Inc. S'holder Litig.*, C.A. 6346-VCN (Del. Ch. Nov. 15, 2011) (approving $23.7 settlement in transaction valued at $2.4 billion, or a 0.98% increase in the merger consideration).

Moreover, setting aside the fact that that provable damages could end up to be a fraction of Lead Plaintiffs' expert's preliminary damages analysis had the case moved forward through trial and appeal, when measured against the results in comparable cases (discussed above), Lead Counsel achieved a sizeable recovery for Settlement Class members, a result that fully supports the fee award requested. *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1176 (S.D. Cal. 2007) (finding this factor supported the request for attorneys' fees where "prolonging a resolution of the case would increase the risk that the funds available for judgment would be depleted due to litigation expenses").

### ii.    The Risks of Litigation

Numerous courts have recognized that risk, including uncertainty as to whether an ultimate recovery would be obtained, is an important factor in determining a fair fee award. *See, e.g., Vizcaino*, 290 F.3d at 1048; *OmniVision*, 559 F. Supp. 2d at 1047 (citing *Vizcaino*); *WPPSS*, 19 F.3d 1291, 1299-301 (9th Cir. 1994); *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 117 (3d Cir. 1976); *Spann*, 211 F. Supp. 3d at 1264 ("[t]he contingent nature of the work performed by class counsel here, including the risk they took in advancing costs, also weighs in favor of granting the fee request."). As explained above in Section III.A.3.i, *supra*, while both Lead Counsel and Lead Plaintiffs believe that the claims asserted in this Action are strong and that the Class would ultimately prevail against Defendants, they recognized, nonetheless, that there existed real uncertainty regarding the outcome of the case. (Holleman Decl. at ¶¶ 28-37.) *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 125 (D.N.J. 2002) ("Regardless of the strength of case counsel might present at trial, victory in litigation is never guaranteed.").

The real risk of Lead Counsel receiving no compensation for their efforts in this litigation is an important, if not the foremost, factor in adjusting the attorneys' benchmark percentage upward. *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *21 (C.D. Cal. June 10, 2005). Thus, obtaining a $3.059 million benefit for the Class is a significant recovery for the Class in the face of these very substantial risks.

### iii.    The Skill Required and the Quality of Representation

Lead Counsel effectively prosecuted this action, culminating in a favorable recovery for the Class. The "prosecution and management of a complex national class action requires unique legal skills and abilities." *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009). Given the complex issues presented in this Action, it is Lead

---

Counsel's opinion that no less than highly skilled counsel could have successfully represented the Class and obtained such a favorable recovery. Thus, the standing and prior experience of Lead Counsel are relevant in determining fair compensation. *See, e.g., Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478, 480 (S.D.N.Y. 1970); *Spann*, 211 F. Supp. 3d at 1263. Courts reward skilled counsel for pursuing hard cases to meet "the stated goal in percentage fee-award cases of 'ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation.'" *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3d Cir. 2000).

Here, Lead Counsel are experienced and skilled practitioners in the securities litigation field. (Holleman T&E Decl. Ex. A, Hopkins Decl. Ex. A, McGaughey Decl. Ex. A (attaching firm resumes).) Lead Counsel's decades of experience in litigating securities fraud class actions enabled them to successfully deal with the various legal and practical challenges that came their way. Given the complexity of the issues presented in this Action, only skilled counsel who applied themselves diligently could have obtained such a favorable recovery. Ultimately, the information obtained proved valuable, and Lead Counsel was thus able to negotiate an impressive $3,059,000 Settlement. Thus, the quality of Lead Counsel's work on this case is reflected in the significant recovery obtained. *See Spann*, 211 F. Supp. 3d at 1263.

The quality of opposing counsel is also important in evaluating the quality of the work done by Lead Counsel. *See, e.g., In re Equity Funding Corp. of Am. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977). Here, Lead Plaintiffs were vigorously opposed at every stage of the litigation by Cravath, Swaine & Moore LLP, Miller Nash Graham & Dunn LLP, Kirkland & Ellis LLP, K&L Gates LLP, and Stoel Rives LLP, all prominent national law firms that frequently defend public companies in securities class actions, which staffed the case with top-flight legal talent at all levels. Lead Counsel were required to perform with a high level of skill, efficiency,

and professionalism to assemble a case that was strong enough to encourage the Company and its insurers to compensate Settlement Class Members for their losses. The skill demonstrated by Lead Counsel supports the requested fee. *See, e.g., OmniVision*, 559 F. Supp. 2d at 1046.

### iv.  The Contingent Nature of the Fee and the Financial Burden Carried by Lead Counsel

Lead Counsel undertook this matter on a contingent fee basis, assuming a substantial risk that they would have to devote a significant amount of time and incur substantial expenses in prosecuting this action without any assurance of being compensated for their efforts. The contingent nature of Lead Counsel's fee should be given substantial weight in assessing the requested fee award. *See Spann*, 211 F. Supp. 3d at 1264 ("[t]he contingent nature of the work performed by class counsel here, including the risk they took in advancing costs, also weighs in favor of granting the fee request."). It has been long-recognized that an attorney is entitled to a larger fee when the compensation is contingent rather than fixed on a time or contractual basis. *See Vizcaino*, 290 F.3d at 1048-50. As stated by the Ninth Circuit:

> It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases. . . . as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

*WPPSS*, 19 F.3d at 1299-300 (internal citations and quotations omitted). *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success."); *Omnivision*, 559 F. Supp. 2d at 1047 ("The importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee.");

*Petropoulous v. FCA US LLC*, No. 17cv0398, 2019 WL 2289399, at *3 (S.D. Cal. May 29, 2019) ("[A] contingent fee contract, since it involves a gamble on the result, may properly provide for a larger compensation than would otherwise be reasonable."). "Indeed, the risk of no recovery in complex cases [of this type] is very real." *In re Veeco Instruments Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85554, at *20 (S.D.N.Y. Nov. 7, 2007). There are numerous class actions in which lead counsel have expended thousands of hours and received no remuneration whatsoever despite their diligence and expertise. The risks of contingent litigation are also highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after a great deal of time and effort have been expended on the case.

Because the fee in this matter was entirely contingent, the only certainty was that there would be no fee without a successful result and that such a result would be realized only after considerable and difficult effort. Lead Counsel have received no compensation during the course of this action and have committed substantial resources of both time and money to the vigorous and successful prosecution of this action for the benefit of the Settlement Class. Accordingly, the contingent nature of Lead Counsel's representation strongly favors the requested award.

### v.    Awards in Similar Cases

Although the Ninth Circuit has established 25% to be the "benchmark" award for attorneys' fees in common fund cases, courts in this Circuit have found "that rate [to] be unreasonable in some cases" and have "consistently approved attorney fee awards over the 25% benchmark." *In re Heritage Bond Litig.*, MDL No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13555, at *58-59 n. 12 (C.D. Cal. June 10, 2005) (awarding 33 1/3% of $27.783 million settlement fund); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377-79 (N.D. Cal. 1989) (awarding 32.8% of the fund, and noting

that a 30% benchmark is "better practice").[4] In securities class actions in particular, awards

typically exceed the benchmark. *Omnivision*, 559 F. Supp. 2d at 1047-48 ("awards of thirty percent

are not uncommon in securities class actions") (citing *Ikon Office Solutions, Inc., Secs. Litig.*, 194

F.R.D. 166, 194 (E.D. Pa. 2000)); *In re Zynga Inc. Sec. Litig.*, No. 12-CV-04007-JSC, 2016 WL

537946, at *18 (N.D. Cal. Feb. 11, 2016) ("in many securities class actions, the award has

exceeded the 25 percent benchmark."). That is because securities class actions are especially

expensive and risky. *Stanger v. China Electric Motor, Inc.*, 812 F.3d 734, 741 (9th Cir. 2016) (risk

enhancement of attorneys' fees is "especially important in securities cases").

Moreover, ample support exists in the Ninth Circuit for awarding percentage fees to

plaintiff's counsel that are equal to Lead Counsel's Fee Request. *See, e.g., Dunleavy v. Nadler (In*

*re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 460 (9th Cir. 2000) (affirming award of fees equal

to one-third of total fund); *Morris v. Lifescan, Inc.*, 54 Fed. App. 663, 664 (9th Cir. 2003) (33

percent); *In re Heritage Bond Litig.*, No. 02-ML-1475-DT(RCX), 2005 WL 1594389, at *9 (C.D.

Cal. June 10, 2005) (one third); *Deaver v. Compass Bank*, No. 13cv00222, 2015 WL 8526982, at

*11 (N.D. Cal. Dec. 11, 2015) (awarding one-third of total fund); *Boyd v. Bank of Am. Corp.*, No.

---

[4] The benchmark can be adjusted upward or downward so long as the adjustment is
"accompanied by a reasonable explanation of why the benchmark is unreasonable under the
circumstances." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d at 273. "Courts may observe
the following factors when determining whether the benchmark percentage should be adjusted: (1)
the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4)
counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel;
(7) the reaction of the class; and (8) comparison with counsel's loadstar." *Heritage Bond Litig.*,
2005 U.S. Dist. LEXIS 13555, at *59-60. *See also In re Pacific Enters. Sec. Litig.*, 47 F.3d 373,
379 (9th Cir. 1995). Ultimately, the "benchmark percentage should be adjusted, or replaced by a
loadstar calculation, when special circumstances indicate that the percentage recovery would be
either too small or too large in light of the hours devoted to the case or other relevant factors."
*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1376, 1370 (9th Cir. 1993) (*quoting Six (6) Mexican
Workers, 904 F.2d at 1311*).

SACV 13-0561-DOC, 2014 WL 6473804, at *10 (C.D. Cal. Nov. 18, 2014) (same); *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1209 (C.D. Cal. 2014) (33 percent).[5]

Here, more than a "benchmark" award is warranted. Lead Counsel have litigated this Action for more than three years, devoting over 9,310.96 hours to prosecuting and resolving the Class' claims. The significant time and effort devoted by Lead Counsel to the Action, along with the other factors discussed herein, justifies the Court's upward adjustment from the Ninth Circuit's benchmark fee percentage, and weighs strongly in favor of Lead Counsel's Fee Request.

### 3. The Reaction of the Class Supports the Fee Request

Although not a factor specified in *Vizcaino*, courts also consider the reaction of the class when deciding whether to award the requested fee. *See, e.g. Immune Response*, 497 F. Supp. 2d at 1177; *In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 305 (3d Cir. 2005) (finding that "low level of objections is a rare phenomenon"). Here, notice of the proposed Settlement was mailed to 4,003 potential Class Members, advising that Lead Counsel would be requesting an award of attorneys' fees not to exceed 33.3% of the Settlement Amount and reimbursement of out-of-pocket expenses not to exceed $400,000 plus interest on both amounts at the same rate earned on the Settlement Fund, all to be paid from the Settlement Fund. As of the filing of this Memorandum, not one recipient of the Notice has objected to these requests. (Holleman Decl. ¶ 43.) The lack of dissent

---

[5]    *See also Johnson v. Aljian*, No. CV 03-5986 DMG (PJWx), slip op. at 5 (C.D. Cal. Sept. 16, 2010) (awarding 33 1/3% of $8.1 million settlement fund); *In re Interlink Elec., Inc. Sec. Litig.*, No. CV05-8133AG, slip op. at 4 (C.D. Cal. June 1, 2009) (awarding 33 1/3% of $5 million settlement fund); *Jenson v. First Trust Corp.*, No. 05-CV-03124-ABC-CT, 2008 U.S. Dist. LEXIS 45078, at *10 (C.D. Cal. June 9, 2008) (awarding 33% of $8.5 million settlement fund); *In re Mikohn Gaming Corp. Sec. Litig.*, No. 2:05-CV-01410, slip op. at 7 (D. Nev. June 6, 2007) (awarding 33.33% of $2.8 million settlement fund); *In re En Pointe Techs., Inc. Sec. Litig.*, No. 01-CV-0205, slip op. at 5 (S.D. Cal. Sept. 29, 2006) (awarding 33 1/3% of $1.8 million settlement fund); *In re 2TheMart.com, Inc. Sec. Litig.*, No. SACV-99-1127, slip op. at 2 (C.D. Cal. July 8, 2002) (awarding 33 1/3% of $2.7 million settlement fund).

---

to Lead Counsel's request for attorneys' fees and expenses, to date, weighs in favor of Lead Counsel's Fee Request. *Mark v. Valley Ins. Co.*, No. CV 01-1575-BR, 2005 WL 1334374, at *2 (D. Or. May 31, 2005).

### 4.     Lead Counsel's Lodestar Supports the Requested Fee Award

As a "cross-check" on the reasonableness of a requested fee award, courts often compare counsel's lodestar with the fee request made under the percentage of the fund method. *See Vizcaino*, 290 F.3d at 1048-50. *See also In re Petroleum Prods. Antitrust Litig.*, 109 F.3d 602 (9th Cir. 1997) (comparison of the lodestar fee to the percentage fee is an appropriate measure of a percentage fee's reasonableness). Further, "the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted [and] may provide a useful perspective on the reasonableness of a given percentage award." *Vizcaino*, 290 F.3d at 1050. *See also In re Sterling & Foster, Inc. Sec. Litig.*, 238 F. Supp. 2d 480, 490 (E.D.N.Y. 2002) ("the fact that any reasonable fee would necessarily represent a negative multiplier of the lodestar supports an award at the higher end of the spectrum") (citations omitted).

As detailed herein and in the accompanying Holleman Declaration (as well as the Holleman Fee Declaration, Hopkins Declaration, and McGaughey Declaration annexed thereto as Exhibits 4, 5, and 6, respectively) the work undertaken by Lead Counsel wholly supports the Court's approval of Lead Counsel's Fee Request. Lead Counsel devoted over 9,310.96 hours to this Action, amounting to $4,503,208.90 in billable time. (Holleman Decl. ¶¶ 53-54; Holleman Fee Decl. ¶¶ 3-5 (Holleman Decl. Ex. 4); Hopkins Decl. ¶¶ 3-5 (Holleman Decl. Ex. 5); McGaughey Decl. ¶¶ 3-5 (Holleman Decl. Ex. 6). As a result, Lead Counsel's request for $1,018,647.00 (*i.e.*, 33.3% of the Settlement Fund) amounts to substantially *less* than the time actually spent on this case. In other words, Lead Counsel's request for attorneys' fees reflects a discount on the time

Lead Counsel actually spent litigating the matter and requires the application of a *less than one* multiplier. Holleman Decl. ¶ 55. This fact militates in favor of the reasonableness of Lead Counsel's Fee Request, as courts have repeatedly recognized that the reasonableness of the fee request under the percentage method "is reinforced by evidence that the percentage fee would represent a negative multiplier of the lodestar." *In re Blech Sec. Litig.*, No. 94-CV-7696 (RWS), 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000); *see also Grivas v. Metagenics, Inc.*, 2019 WL 2005792, at *2 (C.D. Cal. May 6, 2019) (negative multiplier "further speak[s] to the reasonableness of the request").

### F.  Lead Counsel Is Entitled to Reimbursement for Their Reasonable Expenses

It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the award of attorney's fees those out-of-pocket expenses that 'would normally be charged to a fee paying client'") (citation omitted). Lead Counsel incurred out-of-pocket expenses of $317,922.40 in prosecuting this Action and respectfully request an award for reimbursement of these expenses. (Holleman Decl. ¶¶ 67-70; Holleman Fee Decl. ¶¶ 6; Hopkins Decl. ¶¶ 6; McGaughey Decl. ¶¶ 6.

The appropriate analysis to apply in deciding which expenses are compensable in a common fund case is whether the particular costs are of the type typically billed by attorneys to paying clients in the marketplace. *In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1366 (N.D. Cal. 1996) (stating that "[r]easonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionally by those class members who benefit by the settlement"). The categories of expenses for which Lead Counsel seek reimbursement here are the type of expenses routinely charged to hourly fee paying clients, and, therefore, should be

reimbursed out of the common fund. The bulk of expenses in the case are mediation-related expenses, court reporters for depositions, travel for court appearances and depositions, and expert fees. Expenses also include the costs of computerized research, reflecting ordinary charges for computerized factual and legal research services such as Westlaw and Lexis. Further, counsel's expenses include those for copying, postage, faxing, etc. Such expenses are appropriately compensable from a common fund, because "Plaintiffs' out-of-pocket expenses for copying, postage, faxing, computer research, and Federal Express shipping are routinely billed to fee-paying clients and thus are all compensable as part of a reasonable attorney's fee." *Tax Analysts v. I.R.S.*, No. CIV. A. 94-923 (GK), 1999 WL 744169, at *1 (D.D.C. Sept. 3, 1999).

In addition, Lead Counsel had to travel for mediation, hearings, and depositions, and thus incurred moderate costs for travel, meals and lodging. The expenses in this category are reasonable in amount and are properly charged against the common fund. *Immune Response*, 497 F. Supp. 2d at 1177. Because the expenses were incurred with no guarantee of recovery, Lead Counsel had a strong incentive to keep them as low as reasonably possible- and did so. Indeed, total expenses of $317,922.40 are significantly less than the $400,000 estimate contained in the Notice. As the expenses were relatively small compared to the recovery obtained (10.4% of the $3,059,000 million settlement), and were incurred on an ongoing basis for such items as expert fees, mediation, legal research, copying and other expenses necessarily incurred and directly related to the prosecution of the case, the total amount of expenses is reasonable and should be reimbursed in full from the common fund following payment of attorneys' fees.

### G.    The Court Should Include Lead Plaintiffs' Applications for Service Awards

Lead Counsel request that the Court approve the payment of service awards in the amount of $15,000 to Lead Plaintiff Azar and $7,500 to Lead Plaintiff Alfange to each for their expenses

and lost wages. The Settling Parties have agreed that such a request is appropriate. Stipulation at ¶ 7.4. Courts in this Circuit and around the country have commonly paid incentive awards to named plaintiffs in complex litigation in recognition of their involvement in the lawsuit.[6]

Here, Lead Plaintiffs have diligently and competently fulfilled their obligations as representative plaintiffs by: (i) reviewing pleadings and familiarizing themselves with the claims at issue; (ii) making themselves available for discovery, including sitting for depositions; and (iii) making themselves consistently available to plaintiffs' counsel to discuss such issues as the status of the litigation and the terms of the proposed Settlement. Under the circumstances here found, Lead Counsel respectfully submit that it would be appropriate for the Court to award each the requested award for their services in the case.

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court issue an order substantially in the form of the proposed Order and Final Judgment (a) certifying the proposed Settlement Class; (b) approving the Settlement; (c) approving the Plan of Allocation; (d) appointing Lead Plaintiffs as class representatives and Lead Counsel as class counsel; (e) approving Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses; and (f) approving Lead Counsel's application for service awards to Lead Plaintiffs.

---

[6] *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (court upheld $25,000 service award to single class representative); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001) ($50,000 service award to lead plaintiff); *In re S. Ohio Corr. Facility*, 175 F.R.D. 270, 273 & n.3 (S.D. Ohio 1997) (collecting cases) ($25,000 service award paid to each named representative); *In re Dun & Broadstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding class representatives awards ranging from $35,000 to $55,000); *Liberte Capital Grp. v. Capwill*, No. 5:99 CV 818, 2007 U.S. Dist. LEXIS 64869, at *15 (N.D. Ohio Aug. 29, 2007) (court approved combined payment of over $190,000 to two named representatives); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535-36 (E.D. Mich. 2003) (total service award of $160,000 divided among six named plaintiffs).

Dated: July 25, 2019

**JOHNSON FISTEL, LLP**

By: /s/ W. Scott Holleman

W. Scott Holleman (admitted *pro hac vice*)
ScottH@johnsonfistel.com
99 Madison Avenue, 5th Floor
New York, NY 10016
Tel. (212) 802-1486

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
shopkins@zlk.com
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel. (203) 992-4523

*Lead Counsel for Plaintiffs*

**MCGAUGHEY ERICKSON**
Robert J. McGaughey, OSB #800787
bob@law7555.com
Aurelia Erickson, OSB #126170
aurelia@law7555.com
Kevin P. Kress, OSB #146003
kevin@law7555.com
65 SW Yamhill Street, Suite 200
Portland, OR 97204
Tel. (503) 223-7555

*Liaison Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, W. Scott Holleman, hereby certify that on July 25, 2019, I served the foregoing Motion

for Final Approval of Class Action Settlement by electronic email on counsel of record for the

parties.

Dated: July 25, 2019

/s/ W. Scott Holleman         
W. Scott Holleman
