# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ELIA AZAR** and **DEAN ALFANGE**, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>**BLOUNT INTERNATIONAL, INC., JOSHUA L. COLLINS, DAVID A. WILLMOTT, ROBERT E. BEASLEY, JR., RONALD CAMI, ANDREW C. CLARKE, NELDA J. CONNORS, E. DANIEL JAMES, HAROLD E. LAYMAN, MAX L. LUKENS,** and **DANIEL J. OBRINGER**,<br><br>        Defendants. | Case No. 3:16-cv-0483-SI<br><br>**OPINION AND ORDER APPROVING IN PART SETTLEMENT, ATTORNEY'S FEES, EXPENSES, AND SERVICE AWARDS** |

Robert J. McGaughey, Aurelia J. Erickson, and Kevin Kress, MCGAUGHEY ERICKSON, 65 SW Yamhill Street, Suite 200, Portland, OR 97204; W. Scott Holleman, JOHNSON FISTEL LLP, 99 Madison Avenue, Fifth Floor, New York, NY 10016; and Shannon L. Hopkins, LEVI & KORSINSKY LLP, 30 Broad Street, 24th Floor, New York, NY 10004. Lead Counsel for Plaintiffs.

Joshua M. Sasaki and Ian Christy, MILLER NASH GRAHAM & DUNN LLP, 3400 U.S. Bancorp Tower, 111 SW Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendants Blount International, Inc., Robert E. Beasley, Jr., Ronald Cami, Andrew C. Clarke, Nelda J. Connors, E. Daniel James, Harold E. Layman, Max L. Lukens, and Daniel J. Obringer.

Gary A. Bornstein and Nicole D. Valente, CRAVATH, SWAINE & MOORE LLP, 825 Eighth Avenue, New York, NY 10019. Of Attorneys for Defendants Blount International, Inc., Andrew C. Clarke, Nelda J. Connors, E. Daniel James, and Harold E. Layman.

Lawrence J. Portnoy and Rebecca L. Martin, DAVIS POLK & WARDWELL LLP, 450 Lexington Avenue, New York, NY 10017. Of Attorneys for Defendants Robert E. Beasley, Jr., Ronald Cami, Max L. Lukens, and Daniel J. Obringer.

B. John Casey, K&L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97258; Jay P. Lefkowitz and Nathaniel J. Kritzer, KIRKLAND & ELLIS LLP, 601 Lexington Avenue, New York, NY 10022. Of Attorneys for Defendants Joshua L. Collins and David A. Willmott.

**Michael H. Simon, District Judge.**

This matter comes before the Court on Plaintiffs' unopposed motion for final approval of class settlement ("Final Approval Motion") and Plaintiffs' counsel's motion for attorney's fees, costs, and a service award for each class representative, submitted as part of Plaintiffs' Final Approval Motion.[1] ECF 148. The Court held an initial final approval hearing on September 9, 2019, to determine: (1) whether the terms and conditions of the Stipulation of Settlement, ECF 145, ( "Stipulation" or "Settlement") are fair, reasonable, and adequate for the settlement of all claims asserted by Lead Plaintiffs Elia Azar and Dean Alfange (collectively, "Lead Plaintiffs") against Blount International, Inc. ("Blount"), Joshua L. Collins, David A. Willmott, Robert E. Beasley, Jr., Ronald Cami, Andrew C. Clarke, Nelda J. Connors, E. Daniel James, Harold E. Layman, Max L. Lukens, and Daniel J. Obringer (collectively "Defendants"); (2) whether to approve the proposed plan of allocation as a fair and reasonable method to

---

[1] Although Plaintiffs' counsel argued their request for fees and costs in the memorandum in support of Plaintiffs' motion for final approval of the settlement agreement, such requests are properly brought by counsel, not plaintiffs, and as a separate motion. *See, e.g.*, Fed. R. Civ. P. 23(h); *Dickerson v. Cable Commc'ns, Inc.*, 2013 WL 6178460, at *1 n.1 (D. Or. Nov. 25, 2013); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *18 n.11 (C.D. Cal. June 10, 2005).

allocate the Settlement Fund[2] among Class Members; (3) whether to approve the requested attorney's fees and expenses; and (4) whether to approve the requested service, or incentive, awards for the Lead Plaintiffs. The Court continued the hearing because counsel for Defendants failed to comply with the requirements of the Class Action Fairness Act ("CAFA"), specifically, to provide the notice required under 28 U.S.C. § 1715(b), (d). The Court continued the Fairness Hearing and consideration of Plaintiffs' motion until after Defendants' counsel provided notice under CAFA.

The Court has considered the Final Approval Motion, the Stipulation, the papers submitted in connection with the motion, the arguments of counsel, the response of Class Members to the Notice of Pendency and Proposed Settlement of Class Action ("Notice"), and the files, records, and proceedings in the above-captioned action ("Action"). The Court finds good cause to give final approval to the Settlement and the Plan of Allocation. The Court also grants in part Plaintiff's counsel's requested attorney's fees, expenses, and service awards.

## STANDARDS

### A.  Approval of Class Action Settlement

Under Rule 23(e) of the Federal Rules of Civil Procedure, "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Thus, to approve a class action settlement, a court must find

---

[2] Unless otherwise indicated, all capitalized terms used herein have the same meanings as set forth and defined in the Stipulation.

that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(3); *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012).

The settlement must be considered as a whole, and although there are "strict procedural requirements on the approval of a class settlement, a district court's only role in reviewing the substance of that settlement is to ensure it is 'fair, adequate, and free from collusion.'" *Lane*, 696 F.3d at 818-19 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). There are a number of factors guiding this review, including: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Id.* at 819. Courts within the Ninth Circuit "put a good deal of stock in the product of an arms-length [*sic*], non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

Class action settlements involve "unique due process concerns for absent class members who are bound by the court's judgments." *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1168 (9th Cir. 2013) (quotation marks and citation omitted). When the parties negotiate the settlement agreement before formal class certification, as in this case, the court should engage in "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." *Id.* (quotation marks and citation omitted). This more "exacting review" is warranted "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*, 696 F.3d at 819.

The Ninth Circuit has recognized, however, that "[j]udicial review also takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Thus, there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc). (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)).

## B. Approval of Attorney's Fees and Expenses

Requests for attorney's fees must be made by a motion pursuant to Federal Rules of Civil Procedure 54(d)(2) and 23(h), and notice of the motion must be served on all parties and class members. Fed. R. Civ. P. 23(h). When settlement is proposed along with a motion for class certification, notice to class members of the fee motion ordinarily accompanies the notice of the settlement proposal itself. Advisory Committee Notes to Fed. R. Civ. P. 23(h). The deadline for class members to object to requested fees must be set after the motion for the fees and documents supporting the motion have been filed. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010). "Allowing class members an opportunity thoroughly to examine counsel's fee motion, inquire into the bases for various charges and ensure that they are adequately documented and supported is essential for the protection of the rights of class members." *Id.* at 994.

In considering the amount of attorney's fees for class counsel where there is a common fund, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). Under either method, the court must exercise its discretion to achieve a "reasonable" result. *Id.* Because reasonableness is the goal, "mechanical or formulaic application of either method, where it

yields and unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002). When using the percentage method, 25 percent is the "benchmark" fee award, but the Court may adjust this amount upward or downward when "special circumstances" warrant a departure. *In re Bluetooth*, 654 F.3d at 942. Courts must place in the record the relevant special circumstances. *Id*. Factors that a court may consider in making such a departure include: (1) the result obtained; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of nonpayment assumed by counsel; (7) the reaction of the class; (8) non-monetary or incidental benefits, including helping similarly situated persons nationwide by clarifying certain laws; and (9) comparison with counsel's lodestar. *See Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1048-50 (9th Cir. 2002); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *18 (C.D. Cal. June 10, 2005).

## DISCUSSION

### A.  Final Certification of the Settlement Class

#### 1.  Notice to the Class

The Court granted preliminary approval to the parties' proposed notice procedure after the parties made certain amendments to the notice requested by the Court. *See* ECF 142, 143, 144, 145. The Court is satisfied that the notice procedure was carried out according to the applicable standards. The Court finds that notice of the Stipulation was given to the Settlement Class by the best means practicable under the circumstances, including mailing the Notice to Class Members, posting the Notice, Proof of Claim, Stipulation, and Preliminary Approval Order on a dedicated website, and publishing the Summary Notice in *Investor's Business Daily* and on *PR Newswire*.

The Notice provided Class Members with all required information including, among other things: (1) a summary of the Action and the claims asserted; (2) a clear definition of the Settlement Class; (3) a description of the material terms of the Stipulation; (4) the fact that no affirmative action was needed to receive the benefit of class membership, but notice that Class Members could opt out of the Settlement Class; (5) an explanation of Class Members' opt-out rights, the date by which Class Members must opt out, and information about how to do so; (6) explaining the release of claims should Class Members choose to remain in the Settlement Class; (7) instructions about how to object to the Stipulation and the deadline for Class Members to submit any objections; (8) instructions about how to object to the requested attorney's fees, expenses, and service awards and the deadline for Class Members to submit any objections; (9) the date, time, and location of the final approval hearing; (10) the internet address for the settlement website and the telephone number from which Class Members could obtain more information on the Stipulation; (11) contact information for the  settlement administrator and the Court; and (12) information about how Lead Counsel and the Class Representative would be compensated. The notice is sufficient. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012) (reaffirming that a class notice need only "generally describe[] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard" (alteration in original) (quoting *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009)).

The form and method of notifying the Settlement Class fairly and adequately advised Class Members of all relevant and material information about the Action and the proposed Stipulation. The Court finds that the notice satisfies the requirements of due process and Rule 23

and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.*, as amended

("PSLRA").

## 2. Final Certification

Plaintiffs move without objection to resolve this case as a settlement class defined as:

> all persons who held Blount common stock continuously from
> March 4, 2016, the record date for voting on the Transaction,
> through April 12, 2016, when the Transaction was completed.
> Excluded from the Class are Defendants, the Purchasers, the
> officers and directors of the Company at all relevant times,
> members of the immediate families of the Individual Defendants
> and their legal representatives, heirs, successors or assigns, any
> entity in which Defendants have or had a controlling interest, and
> any Person who timely and validly seeks exclusion from the Class.

To certify a settlement class, the requirements of Rule 23 of the Federal Rules of Civil

Procedure must be satisfied. *See Hanlon*, 150 F.3d at 1019. Under Rule 23, the plaintiff "must be

prepared to prove" that each of the requirements of the Rule is satisfied. *Wal-Mart Stores, Inc. v.

Dukes*, 564 U.S. 338, 350 (2011). Rule 23 sets forth more than a "mere pleading standard." *Id.*

On the other hand, Rule 23 provides district courts with broader discretion to certify a class than

to deny certification. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013).

A party seeking class certification must satisfy each of the requirements of Rule 23(a)

and at least one requirement of Rule 23(b). *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542

(9th Cir. 2013). Under Rule 23(a), a district court may certify a class only if:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law and fact common to
> the class; (3) the claims or defenses of the representative parties
> are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a). In other words, a proposed class must meet the requirements of

numerosity, commonality, typicality, and adequacy of representation. *Mazza v. Am. Honda*

*Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). Rule 23 also requires, implicitly, that the members of the proposed class be ascertainable based on objective criteria. *Ott v. Mortg. Inv'rs Corp. of Ohio, Inc.*, 65 F. Supp. 3d 1046, 1064 (D. Or. 2014). Along with the five requirements of Rule 23(a), the party seeking to maintain a class action also must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

The Rule 23 analysis is "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351 (quotation marks omitted); *Comcast Corp.*, 569 U.S. at 33-34. This "rigorous" review applies even when certification is for settlement purposes only. *See, e.g.*, *In re Hyundai*, 926 F.3d at 556. Still, Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* A district court, however, "*must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (emphasis in original).

The parties agreed to certification of the class for settlement purposes, and the Court previously agreed that the class met the requisite factors in conditionally certifying the class for settlement purposes in the preliminary approval of the Stipulation. The Court, however, must now conduct a "rigorous" analysis of the factors.

### a. Rule 23(a)

#### i. Numerosity

In this district, there is a "rough rule of thumb" that 40 class members is sufficient to meet the numerosity requirement. *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 590 (D.

Or. 2013); *see also Wilcox Dev. Co. v. First Interstate Bank of Or., N.A.*, 97 F.R.D. 440, 443 (D. Or. 1983) (same); 1 *McLaughlin on Class Actions* § 4:5 (15th ed.) ("The rule of thumb adopted by most courts is that proposed classes in excess of 40 generally satisfy the numerosity requirement."). The claims administrator sent 5,304 Notice packets to potential Class Members and their Nominees. This shows that there likely are thousands of Class Members. The Court finds that the numerosity requirement is met.

### ii.  Commonality

To satisfy the commonality requirement, Plaintiffs must show that the class members suffered the "same injury"—that their claims depend upon a "common contention." *Wal-Mart*, 564 U.S. at 350 (quotation marks omitted). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Class members, however, need not have *every* issue in common: commonality requires only "a single significant question of law or fact" in common. *Mazza*, 666 F.3d at 589; *see also Wal-Mart*, 564 U.S. at 359. The Class Members have the significant issues of law and fact in common, including whether Defendants misstated or omitted material facts in public statements and filings with the U.S. Securities and Exchange Commission and whether Defendants violated securities laws. *See, e.g.*, *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 12462472, at *4 (C.D. Cal. Nov. 3, 2014) (finding commonality in a case involving similar allegations); *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *5 (N.D. Cal. Jan. 13, 2005), *amended sub nom. In re Verisign, Inc. Sec. Litig.*, 2005 WL 226154 (N.D. Cal. Jan. 31, 2005) (noting that "commonality 'is easily met in cases where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties, even when damages

vary'" (quoting Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS § 22:21 (4th ed. 2002))). Thus, the commonality requirement is satisfied.

### iii. Typicality

To meet the typicality requirement, Plaintiffs must show that the named parties' claims or defenses are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). Under the "permissive standards" of Rule 23(a)(3), the "representative's claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). To determine whether claims and defenses are typical, courts look to "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (quotation marks omitted); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). Lead Plaintiffs' claims are based on the same conduct as the claims of the Settlement Class and all Class Members have the same or similar injury. Thus, Lead Plaintiffs present claims that are typical of the claims held by each Class Member.

### iv. Adequacy

Rule 23(a)(4) states that before a class can be certified, a court must find that "the representative parties will fairly and adequately protect the interests of the class." This requirement turns on two questions: (1) whether "the named plaintiffs and their counsel have any conflicts of interest with other class members"; and (2) whether "the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020. The adequacy requirement is based on principles of constitutional due process; accordingly, a

court cannot bind absent class members if class representation is inadequate. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940); *Hanlon*, 150 F.3d at 1020.

Lead Plaintiffs have shown that they understand and accept their responsibilities as Class Representatives. Lead Plaintiffs have not demonstrated interests that are adverse to the Class Members. There is no conflict of interest in this action, and there is no disagreement between Plaintiffs' interests and those of the Class Members. Additionally, Lead Counsel and Lead Plaintiffs have vigorously prosecuted this action for more than three years. The Court therefore finds adequacy of representation.

### v. Ascertainability

Ascertainability, although "not expressly required" by Rule 23, is a threshold requirement for class certification. *Ott*, 65 F. Supp. 3d at 1064. A proposed class must be "precise, objective, [and] presently ascertainable." *See Williams v. Oberon Media, Inc.*, 468 F. App'x 768, 770 (9th Cir. 2012) (alteration added) (quotation marks omitted). Class members must be identifiable through "a manageable process that does not require much, if any, individual factual inquiry." *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 237 (N.D. Cal. 2014) (quoting William B. Rubenstein, 1 *Newberg on Class Actions* § 3:3 (5th ed.)). This requirement does not entail, however, that "*every* potential member . . . be identified at the commencement of the action." *Id.* (quotation marks omitted) (emphasis added). The Class Members here were identifiable from stock purchase records and thus this requirement is met.

### b. Rule 23(b)(3)

Rule 23(b)(3) requires a court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This analysis, in accord with Rule 23's "principal purpose" of "promot[ing]

efficiency and economy of litigation," inquires into "the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963-64 (9th Cir. 2013) (quotation marks omitted). The focus of this inquiry, however, is on "*questions* common to the class"—plaintiffs need not, at this threshold, "prove that the predominating question[s] will be answered in their favor." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459, 468 (2013) (emphasis in original).

"Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants." *In re Verisign*, 2005 WL 7877645, at *9 ("Here, the issues common to the class—namely, the nature and extent of Defendants' alleged misrepresentations and the like—are predominant. . . . A class action is the superior method for managing litigation if no realistic alternative exists." (quotation marks omitted)). Plaintiffs allege that Defendants made false and misleading statements and omissions that led to a merger at a share price that was not a fair value for shareholders and lower than what would have been received without Defendants' alleged misconduct. Whether Defendants made false and misleading statements or omissions is a question common to the class and whether the share price was not a fair value is also a question common to the class. Thus, predominance is met. *See In re Hot Topic*, 2014 WL 12462472 at *5.

Regarding superiority, the purpose of Rule 23(b)(3) is "to allow integration of numerous small individual claims into a single powerful unit." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 722 (9th Cir. 2010). Here, the administrator sent 5,304 Notice packets, showing that there likely are thousands of Class Members who likely have low-value claims and live

throughout the United States. Although they may be entitled to attorney's fees and costs if they prevail in an individual lawsuit, the individual claims likely are too small to justify the cost and effort of private counsel to file and prosecute individual actions. Allowing this action to proceed as a class action appears to be the superior method of adjudicating the controversy given the number of class members and amount of damages at issue for each class member. *In re Hot Topic*, 2014 WL 12462472 at *6.

## B. Settlement Agreement

The Court considers the factors enumerated by the Ninth Circuit as relevant in evaluating whether a settlement agreement is fair, reasonable, and adequate.

### 1. Strength of Plaintiffs' case and the risk, expense, complexity, and likely duration of further litigation and maintaining class action status through trial

Although the Court allowed Plaintiffs' claims to proceed past the motions to dismiss, there is a risk that their claims might not survive dispositive motions or might not prevail at trial. Plaintiffs would have to prove that Defendants made a material false statement or omission in the proxy statement, that the statement was objectively and subjectively false, that Defendants had the requisite state of mind, and that the proxy statement was the transactional cause of harm to Plaintiffs. Plaintiffs would then have to prove that the share price was too low. Besides the risk of dismissal before trial or loss at trial, continued litigation would be expensive and time-consuming. There is a strong likelihood that class certification would be contested and that motions for summary judgment would be filed, requiring significant additional litigation. If claims proceeded beyond those motions, there could be trial and likely appeals. In short, the litigation would be protracted and expensive. Further, without a settlement, Defendants' applicable insurance policy limits will continue to be depleted by defense costs and the available resources likely will be diminished.

## 2. The amount offered in settlement

In considering the potential fairness of the recovery, courts often compare the total amount of recovery in a settlement to the estimated total amount of damages that the plaintiffs could recover if the case was litigated. *See, e.g.*, *In Re Mego Fin. Corp.*, 213 F.3d 454, 459 (9th Cir. 2000). Nonetheless, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Id.* (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982).

The Settlement Agreement provides that Defendants will pay $3,059,000 million to fund a non-reversionary Settlement Fund. This fund will pay the costs of recovery to Class Members, attorney's fees and costs, reimbursement of expenses and costs to the Lead Plaintiffs, and the costs to administer the Settlement, including giving notice to Class Members. After initial distribution as described in the plan of allocation, any monies remaining shall be redistributed to Authorized Claimants and any remaining funds after that redistribution shall be donated to a nonprofit organization designated by Lead Counsel. No funds will revert to Defendants or their insurers.

Plaintiffs' damages expert had estimated damages at $1-1.65 per share. Plaintiffs estimate that there were 40 million outstanding shares at the time of the allegedly misleading proxy statement. Thus, Plaintiffs' total estimated damages were $40-66 million. The Settlement Fund amount therefore is 4.63 to 7.65 percent of the Class's total damages as Plaintiffs estimated.

No objections were raised challenging the sufficiency of the amount offered in settlement. Considering the total recovery of the Settlement and the risks of continued litigation, the Court finds the amount of recovery to be fair, adequate, and reasonable. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (noting that typical recoveries in securities class actions range from 1.6 percent to 14 percent of total losses); *In re Volkswagen*

*"Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2019 WL 2077847, at *2 (N.D. Cal. May 10, 2019) (noting that "the median settlement recovery from 2009 to 2017 was only five percent of damages in securities class actions"); *In re Ravisent Techs., Inc. Sec. Litig.*, 2005 WL 906361, *9 (E.D. Pa. April 18, 2005) (citing study determining "that since 1995, class action settlements have typically recovered 'between 5.5% and 6.2% of the class members' estimated losses'"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (finding that "standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims").

### 3. The extent of discovery completed and the stage of the proceedings

This factor is concerned with whether "the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp.*, 213 F.3d 454, 459 (9th Cir. 2000). This case was litigated for three years. The parties engaged in significant discovery, including written discovery, third-party subpoenas, 19 depositions, and exchanging hundreds of thousands of pages of documents. Lead Counsel also consulted with a financial expert. The parties "carefully investigated the claims before reaching a resolution." *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. Oct. 8, 2014). This factor, therefore, supports approval.

### 4. The experience and views of counsel

"'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (quoting *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997)). "This is because 'parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.'" *Id.* (alteration omitted) (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)). Absent fraud or collusion, courts can, "and should, rely

upon the judgment of experienced counsel for the parties," when assessing a settlement's fairness and reasonableness. *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013). Lead Counsel and Liaison Counsel are experienced litigators. Defendants also are represented by experienced counsel. This factor supports approval.

### 5. Presence of a Government Participant

The Class Action Fairness Act provides in relevant part:

> Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant . . . shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement . . . .
>
> * * *
>
> An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b).

28 U.S.C. § 1715(b), (d). Defendants did not provide the CAFA notice within 10 days of the proposed settlement being filed in Court. Indeed, until the Court questioned the parties shortly before the initial Fairness Hearing about whether the CAFA notice was sent, the parties had not realized that Defendants had overlooked sending notices as required under CAFA. Defendants did not send notice until after the Fairness Hearing. Defendants provided notice of the proposed settlement to the Attorneys General of the United States, all fifty States, Puerto Rico, Guam, American Samoa, Commonwealth of the Northern Mariana Island, the U.S. Virgin Island, and District of Columbia on September 17, 2019. *See* ECF 158. This was 147 days after the proposed settlement was filed with the Court. The 90-day notice period expired on December 16, 2019, with no Attorney General having objected to the proposed settlement.

Although the requirement of 28 U.S.C. § 1715(b) to send notice to state and federal officials within 10 days of filing the proposed settlement with the Court was not complied with, the requirement of § 1715(d) that the state and federal officials have 90 days from when notice was sent to respond to the proposed settlement was followed. Many courts have held "that late mailing of notices to state and federal officials under CAFA is not fatal to approval of settlements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 973 (E.D. Cal. 2012) (citing cases); *see also Thomas v. Magnachip Semiconductor Corp.*, 2017 U.S. Dist. LEXIS 189971, at *5 (N.D. Cal. Nov. 16, 2017) ("Although Avenue Capital's notice was late, it is sufficient as long as the relevant state and federal officials have at least ninety days to review the proposed settlement."); *Jakosalem v. Air Serv Corp.*, 2015 U.S. Dist. LEXIS 117235, at *2-3 (N.D. Cal. Sep. 2, 2015) ("Courts have found that CAFA's notice requirements have been substantially complied with when the relevant state and federal officials have had 90 days to review the proposed settlement, even when notice was sent out late."). Thus, because the Court continued consideration of Plaintiffs' motion until after notice under CAFA was sent and the 90-day response period expired, the Court finds that this deficiency was sufficiently cured.

### 6.  Reaction of the Settlement Class

Of the 5,304 notice packets mailed to the Class Members, no one objected and no one requested to be excluded from the Settlement Class. The participation rate, along with the lack of any objections to the Stipulation, provides a strong presumption that the Stipulation is fair, reasonable, and adequate. *See, e.g.*, *DIRECTV*, 221 F.R.D. at 529 ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement."); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) ("By any standard, the lack of objection of the Class Members favors approval of the Settlement."). Thus, this factor weighs in favor of approval.

### 7. The absence of collusion or other conflicts of interest

Courts considering a pre-class certification settlement must examine whether the settlement was the "result of good faith, arm's-length negotiations or the result of fraud and collusion." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 258 (N.D. Cal. 2015). The Ninth Circuit has identified three signs of collusion: (1) class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply awarded; (2) the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds without objection by a defendant; or (3) the parties arrange for payments not awarded to revert to a defendant rather than to be added to the class fund. *In re Bluetooth*, 654 F.3d at 947.

The Court finds that the Settlement is the product of extensive arm's-length negotiations, with assistance from a third-party mediator, David Geronemus, in multiple mediation sessions. The Court notes that Defendants have and continue to dispute the claims against them and the Action was litigated for three years before the parties reached their proposed Settlement. Moreover, none of the three "subtle" signs of collusion are present here. The Settlement Class is to receive significant monetary benefits that are not disproportionately low compared to the requested attorney's fee award, the payment of attorney's fees is not separate from class funds and there is no "clear sailing" provision by which Defendants agree not to object to Lead Counsel's request for attorney's fees, and the Settlement Fund is non-reversionary.

### 8. Conclusion

After considering the relevant factors and circumstances, the Court finds that the Stipulation is fair, reasonable, and adequate to the Class Members. Each Class Member shall be bound by the Stipulation and this Opinion and Order. The Court also finds, pursuant to Section 21D(c)(1) of the PSLRA, that during the course of the Action, the Settling Parties and

their respective counsel at all times complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure.

Upon the Effective Date, each and all of the Lead Plaintiffs and Class Members, on behalf of themselves and their respective heirs, executors, administrators, successors, and assigns and all persons acting in concert with any such person shall, with respect to each and every Released Claim, waive, release, forever discharge, and dismiss, with prejudice, and agree not to institute, maintain, or prosecute any or all Released Claims against any or all of the Released Persons, and shall be permanently and finally enjoined, without the necessity of posting a bond, from commencing or prosecuting any actions or other proceedings asserting any of the Released Claims either directly, indirectly, or representatively against any of the Released Persons or Defense Counsel.

Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of this Opinion and Order and the concurrently-filed Judgment shall have, fully, finally, and forever released, relinquished and discharged Lead Plaintiffs, each and all of the Class Members, and their attorneys (including, without limitation, Lead Counsel), employees, heirs, successors, and assigns from all claims (including, without limitation, Unknown Claims) arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement or, resolution of the Action and/or the Action. Claims to enforce the Settlement are not released.

Upon the Effective Date, Lead Plaintiffs and all Class Members and anyone claiming through or on behalf of any of them, are forever barred and enjoined from commencing, instituting, or continuing to prosecute any action or proceeding in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind, asserting any of the Released Claims against any of the Released Parties, and each of them.

## C. Service Awards, Attorney's Fees, and Expenses

### 1. Attorney's Fees

The request for attorney's fees was combined with the motion for final approval of the settlement, as noted above. The request, along with supporting documentation, was filed before the deadline for objections, thereby complying with *In re Mercury*. Plaintiffs' counsel requests that the Court apply an upward departure and award attorney's fees in the amount of 33.3 percent of the Settlement Fund. The Court therefore considers whether any of the relevant special circumstances warrant departure from the 25 percent benchmark.

#### a. Results Obtained

The most critical factor in granting attorney's fees is the overall result and benefit to the class. *In re Bluetooth*, 654 F.3d at 942 ("Foremost among these considerations, however, is the benefit obtained for the class."). The Stipulation provides for a $3,059,000 Settlement Fund to pay the Settlement Class, with any amount not awarded as attorney's fees added to the Settlement Fund. The total gross recovery is 4.63 to 7.65 percent of the Class's total damages as estimated by Plaintiffs, which is average for a securities fraud settlement. *See* Section B.2. *supra* (citing cases discussing average securities case recoveries at about five percent, with recoveries ranging from 1.6 to 14 percent). The net recovery estimate, however, would be $1,876,328, after subtracting attorney's fees at the benchmark 25 percent ($764,750), attorney expenses as requested ($317, 922), and estimated claims administrator expenses ($100,000). The net recovery would result in a recovery of 2.8-4.7 percent of the Class's total damages.

This factor does not support an increase above the 25 percent benchmark because whether considering gross or net recovery, the results were not *exceptional*. This factor does not support a downward departure, however, because the estimated gross recovery ranges are average and the estimated net recovery ranges are from slightly below average to below average.

### b. Risk of Litigation

"The risk of costly litigation and trial is an important factor in determining the fee award." *Flores v. ADT LLC*, 2018 WL 1062854, at \*14 (E.D. Cal. Feb. 27, 2018) (citing *Chem. Bank v. City of Seattle* (*In re Wash. Pub. Power Supply Sys. Litig.*), 19 F.3d 1297, 1299-1301 (9th Cir. 1994)). When considering the risks posed in litigation, "the risk of loss in a particular case . . . is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

Although Plaintiffs faced some risks on the merits, they were not greater than in the typical securities fraud case. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at \*13 (N.D. Cal. Dec. 18, 2018) (noting "inherent uncertainties of trying securities fraud cases and the demanding pleading standards of the PSLRA" and awarding attorney's fees of 20 percent of a large settlement fund). Courts have also noted that securities class action cases generally settle, which reduces the risk in bringing these types of cases. *See, e.g.*, *In re Infospace, Inc.*, 330 F. Supp. 2d 1203, 1215 (W.D. Wash. 2004) ("As discussed previously, most securities fraud cases settle, this was not a complex matter, and the risks associated with this litigation were no greater than the risk presented in any other securities action."); *In re Critical Path, Inc.*, 2002 WL 32627559, at \*10 (N.D. Cal. June 18, 2002) ("There was only a modest risk to recovery in both of the settling cases. Most securities-fraud cases settle. Even under the PSLRA, few cases are dismissed completely at the motion-to-dismiss stage." (footnote omitted)). This factor, therefore, is neutral.

### c. Counsel's Skill and Complexity of Issues

"The complexity of issues and skills required may weigh in favor of a departure from the benchmark fee award." *Torchia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 274 (E.D. Cal. 2014). Although the Court does not dispute the skill of Plaintiffs' counsel, this case did not involve

particularly unique or complex issues of securities law. *See Infospace*, 330 F. Supp. 2d at 1215 (finding that this factor was unimportant in a "a garden variety securities case that did not present novel issues of law"). The Court also notes that: (1) there have been some issues with incomplete documentation and the Court had to request that Plaintiffs provide additional information before the Fairness Hearing, at the Fairness Hearing, and thereafter; (2) there was an initial proposed Notice that was rejected; and (3) Plaintiffs' counsel's failed to discover Defendants' failure to send the CAFA notices until the Court specifically asked about the notices. Thus, this factor does not support any increase above the benchmark.

### d. Effort Expended by Counsel

Counsel expended much effort in discovery—document discovery and defending and taking 19 depositions. Counsel also expended effort in defending a motion to dismiss and in attending two mediations. Overall, however, this was not an unusual or exceptional effort. Other cases involve more effort, including litigating class certification and sometimes litigating appeals to the Ninth Circuit or even the Supreme Court. This factor thus does not support a fee above the benchmark.

### e. Reaction of the Class

Class Members reacted positively to the settlement. No Class Members opted out of the class. No one filed any objections to the Stipulation or the proposed attorney's fees, expenses, or service awards. Because, however, this was an "opt-out" class versus an "opt-in" class, Class Members needed to "do nothing" to remain Class Members. It was thus less onerous to remain in the Settlement Class than if it were an opt-in class.[3] Persons who "did something" and submitted

---

[3] Although the Court believes that it is more beneficial for Class Members to have an opt-out class than an opt-in class, under such circumstances the fact that the Settlement Class

claim forms, however, equaled about 60 percent of the total outstanding shares, a strong return

rate. This factor therefore supports an upward departure.

### f. Non-monetary or Incidental Benefits

This factor does not apply, as all the benefits to the Settlement Class are monetary. Thus,

this factor is neutral.

### g. Awards in Similar Cases

The Court's research shows that class action securities cases have awarded above the

benchmark 25 percent, the benchmark 25 percent, and below the benchmark 25 percent,

depending on the facts of the case. *See, e.g.*, *In re Heritage Bond*, 2005 WL 1594389, at *17

(awarding 33.33 percent of a $27.8 million fund); *In re Infospace*, 330 F. Supp. 2d at 1216

(awarding  12 percent of a $34.4 million fund); *In re Critical Path*, 2002 WL 32627559, at *10

(awarding 15 percent of a $17.5 million fund). Thus, this factor is neutral.

### h. Comparison with Counsel's Lodestar

"[T]he lodestar calculation can be helpful in suggesting a higher percentage when

litigation has been protracted [and] may provide a useful perspective on the reasonableness of a

given percentage award." *Vizcaino*, 290 F.3d at 1050. A court, however, is not required to

conduct a lodestar "cross-check." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307

F.3d 997, 1007 (9th Cir. 2002) ("Courts *may* compare the two methods of calculating attorney's

fees in determining whether fees are reasonable." (emphasis added)); *Vizcaino v. Microsoft

Corp.*, 142 F. Supp. 2d 1299, 1305 (W.D. Wash. 2001) ("[I]n making the decision of

---

consists of such a high percentage of Class Members is less persuasive as an indication of
affirmative class support of the settlement.

reasonableness of attorney's fees, the court in a common fund case has discretion to use either the lodestar method or the percentage method." (citation omitted)).

In doing the lodestar cross check, the Court is not performing the detailed lodestar analysis it would have performed if it used the lodestar method to calculate Plaintiff's attorney's fees. For example, the Court will not analyze counsel's time entries in detail for duplicative billing, billing for administrative tasks, or block billing. The cross check is performed at higher level, to ensure the percentage-of-recovery method does not result in a fee that is unreasonable. But it does not require spending the time that is required when performing the lodestar method of fee calculation—otherwise using the percentage-of-recovery method would not allow for the time-savings the Ninth Circuit anticipated when allowing the method "in lieu of the often more time consuming task of calculating the lodestar." *In re Bluetooth*, 654 F.3d at 942.

Plaintiff's counsel calculates the lodestar at $4,503,208.90 based on 9,310.96 billable hours of several partners, associates, of counsel, financial analysts, paralegals, and legal assistants. The time spent by these professionals was calculated at the rates normally charged by their respective firms, including in New York and California, rather than looking at comparable rates in the District of Oregon. The Court usually applies the billing rates within the District of Oregon, which are far lower. The Court also usually only awards $100 per hour for paralegals, and Plaintiffs' lodestar calculations includes charges of $205 to $375 per hour for paralegals. The Court also does not generally award time for legal assistants, absent evidence that the time was not administrative. As a result, the lodestar at rates generally awarded by the Court would be much lower than those calculated by Plaintiffs. Nonetheless, the lodestar would likely still be higher than 25 percent of the settlement fund, and therefore this factor supports an upward departure from the benchmark.

### i. Conclusion

Considering all the factors, the Court perceives no special circumstances justifying an upward departure from the benchmark fee of 25 percent. Although the litigation lasted three years, the time and effort expended by Lead Counsel was not unusual. The only motion litigated was Defendants' motion to dismiss, although the Court and the parties also informally addressed discovery matters three times. Other cases involve much more effort, including litigating class certification, motions for summary judgment, and sometimes litigating appeals to the Ninth Circuit or even the Supreme Court.

The legal and factual issues are not particularly complex, there are no issues of first impression or issues that would clarify certain laws, and the risks involved were no greater than the average case alleging a violation of § 14(a) of the Securities Exchange Act. Although the Court does not dispute the skill of Plaintiffs' counsel, as this was not a particularly unusual § 14(a) case and there was not any unusual litigation efforts, counsel has not shown exceptional skill or quality of work to warrant a departure from the 25 percent benchmark.

Counsel is, however, experienced, did obtain a good result in light of the circumstances, does have a lodestar that likely is higher than a 25 percent fee award, and no class member objected to the settlement or the fee award. Thus, the Court finds that a downward adjustment to the benchmark fee award is also not warranted and that 25 percent of the common fund is a reasonable fee award. The Court therefore awards attorney's fees in the amount of 25 percent of the Settlement Fund—$764,750.[4]

---

[4] The Court notes that the plaintiffs' attorneys in *In re Hot Topic*, a case with similar allegations and one on which Plaintiffs relied in defending against Defendants' motion to dismiss, were awarded 25 percent of the common fund for attorney's fees. *See In re Hot Topic*, Case No. 2:13-cv-02939-SJO-JC, ECF 110, Order Awarding Attorney's Fees and Expenses (November 6, 2015).

The Court acknowledges that this results in a greater negative multiplier than would the 33.33 percent fee requested by Plaintiff. Nonetheless, the Court finds that the fee of $764,750 is fair, reasonable, and adequate compensation given all the circumstances of this case. *See Campbell v. Facebook Inc.*, 2017 WL 3581179, at *7 (N.D. Cal. Aug. 18, 2017) (awarding fees resulting in a 0.497 negative multiplier).

### 2. Attorney's Expenses

Lead Counsel requests $317,922.40 in expenses that counsel asserts were reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action. These expenses include expert fees, filing and service fees, travel expenses, court reporter fees, expenses for meals, *pro hac vice* fees, mediation fees, postage expenses, research fees, electronic discovery document hosting fees, long-distance telephone expenses, and photocopy expenses.

The Court awards attorney expenses in the amount of $317,922.40. The Court finds these expenses have been reasonably and necessarily incurred and are recoverable from the proceeds of the common fund. *See, e.g.*, *Wininger v. SI Mgmt., L.P.*, 301 F.3d 1115, 1120-21 (9th Cir. 2002) (noting that "jurisdiction over a fund allows for the district court to spread the costs of the litigation among the recipients of the common benefit"); *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) ("Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement.").

### 3. Service, or Incentive, Awards

Lead Plaintiffs request service, or incentive, awards in the amount of $15,000 to Plaintiff Azar and $7,500 to Plaintiff Alfange. In their motion, Plaintiffs argue that these requested awards should be granted because Lead Plaintiffs fulfilled their obligations by: "(i) reviewing

pleadings and familiarizing themselves with the claims at issue; (ii) making themselves available

for discovery, including sitting for depositions; and (iii) making themselves consistently

available to plaintiffs' counsel to discuss such issues as the status of the litigation and the terms

of the proposed Settlement." Plaintiffs cite no authority in their motion supporting their

requested awards.

The PSLRA prohibits general incentive or service awards to class representatives. It

establishes that class representatives are only entitled to a "pro rata share of any recovery,"

establishes that the settlement share awarded to representative plaintiffs "shall be equal" to the

share "awarded to all other members of the class," and expressly limits additional awards to class

representatives in securities actions to "reasonable costs and expenses (including lost wages)

directly relating to the representation of the class." 15 U.S.C. § 78u-4(a)(2)(A)(vi), 4(a)(4); *see

also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 960 n.4 (9th Cir. 2009) (noting that the

PSLRA "prohibits granting incentive awards to class representatives in securities class actions"

and that in CAFA "Congress made the following finding: 'Class members often receive little or

no benefit from class actions, and are sometimes harmed, such as where . . . (B) unjustified

awards are made to certain plaintiffs at the expense of other class members. Pub. L. No. 109–2,

§ 2(a)(3), 119 Stat. 4.'" (alteration in original)). Congress enacted this provision to "remove the

financial incentive for becoming a lead plaintiff." H.R. Conf. Rep. No. 104-369 (1995), *as

reprinted in* 1995 U.S.C.C.A.N. 730, 734.

The Court issued an order requesting supplemental briefing and evidence from Lead

Plaintiffs, noting that incentive awards are not permitted under the PSLRA and requesting

additional evidence about whether Lead Plaintiffs incurred any reasonable costs or expenses,

including lost wages, directly relating to representation of the class. ECF 157; *see, e.g.*,

*Schueneman v. Arena Pharm., Inc.*, 2019 WL 6700880, at *1-2 (S.D. Cal. Dec. 9, 2019) (finding

on remand, after incentive award was reversed by the Ninth Circuit as impermissible under the

PSLRA, that the lead plaintiffs had shown no reasonable expenses, costs, or lost wages directly

relating to representation of the class); *In re TVIA Inc. Sec. Litig.*, 2008 WL 2693811, at *1 (N.D.

Cal. July 7, 2008) ("Thus, the court must determine whether what lead plaintiff seeks are

'reasonable costs and expenses (including lost wages) directly relating to the representation of

the class' as permitted under the PSLRA or is instead some other incentive award."); *In re

Heritage Bond Litig.*, 2005 WL 1594403, at *14 (S.D. Cal. 2005) ("[The] Court is mindful as to

distinguish between 'reasonable costs and expenses,' and what appears to be a 'compensation' or

'incentive' award.").

 In their supplemental submission, Plaintiffs again generally request "incentive/service

awards" for the Lead Plaintiffs. Plaintiffs discuss the "policy" reasons for lead plaintiffs in

securities cases to receive these awards, including allowing awards that do not distinguish

between hourly rates for persons at different earning levels and do not distinguish between

retired persons and working persons. It is, however, for Congress to make such policy decisions,

not the Court. Congress specifically decided in the PSLRA not to allow such awards and to only

provide for an award of costs and expenses.

 Plaintiffs' request for a service or incentive award for Lead Plaintiffs is rejected as

impermissible under the PSLRA.[5] *See Rodriguez*, 563 F.3d at 960 n.4; *In re TVIA Inc.*, 2008

---

[5] Plaintiffs cite three cases from the U.S. District Court for the Central District of
California granting incentive awards to lead plaintiffs in securities cases. These cases, however,
applied the general standard for class actions and did not address the PSLRA's prohibition on
incentive awards. *See, e.g.*, *Sudunagunta v. NantKwest, Inc.*, 2019 WL 2183451, at *6 (C.D. Cal.
May 13, 2019); *Todd v. STAAR Surgical Co.*, 2017 WL 4877417, at *6 (C.D. Cal. Oct. 24,
2017); *Vinh Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, at *11 (C.D. Cal. May 6,
2014). The other cases cited by Plaintiffs awarding reimbursement to lead plaintiffs considered

WL 2693811, at *1-2; *see also Schwartz v. Arena Pharm., Inc.*, 775 F. App'x 342, 343 (9th Cir. 2019) (holding that the district court abused its discretion in awarding a $2,000 incentive award because "the Private Securities Litigation Reform Act (PSLRA) does not allow for incentive awards for class representatives" and remanding to the district court to determine whether the lead plaintiffs proved any reasonable costs and expenses, including lost wages, directly related to their representation of the class); *In re ESS Tech., Inc. Sec. Litig.*, 2007 WL 3231729, at *2 (N.D. Cal. Oct. 30, 2007) ("Numerous courts reviewing lead plaintiff fee requests under the PSLRA have concluded that in order to recover under § 78u-4(a)(4), the lead plaintiff must provide meaningful evidence demonstrating that the requested amounts represent actual costs and expenses incurred directly as a result of the litigation." (gathering cases)).

As an alternative request, Plaintiffs withdraw the request for Plaintiff Alfange and request $3,000 for Plaintiff Azar. Plaintiff Azar works as a background actor and is registered with two casting companies. Those casting companies maintain job postings seeking actors on short notice for background roles. Plaintiff Azar is paid between $12 and $25 per hour for those roles, sometimes receiving 1.5 to 2.0 multipliers for overtime. Plaintiff Azar requests a rate of $25 per hour, multiplied by the 120 hours he spent on this case. Simply requesting a per-hour rate for hours spent on the case, however, is not a reasonable expense unless those hours are an "expense" under the PSLRA (*e.g.*, lost wages) and directly connected to representing the class.

---

the awards as reasonable costs and expenses (generally lost wages), and at least one court requested supplemental submissions by the lead plaintiff to prove the requested expenses. *See, e.g.*, *Mauss v. NuVasive, Inc.*, 2018 WL 6421623, at *10 (S.D. Cal. Dec. 6, 2018); *van Wingerden v. Cadiz, Inc.*, 2017 WL 5565263, at *7 (C.D. Cal. Feb. 8, 2017); *Patel v. Axesstel, Inc.*, 2015 WL 6458073, at *9 (S.D. Cal. Oct. 23, 2015); *In re Stec Inc. Sec. Litig.*, 2013 WL 12129391, at *5 (C.D. Cal. May 23, 2013); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1049 (N.D. Cal. 2008); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1173-74 (S.D. Cal. 2007).

*See, e.g.*, *Schueneman*, 2019 WL 6700880, at \*1 ("Schwartz's declaration does not describe any lost wages. Indeed, Schwartz is not in fact requesting 'reasonable costs and expenses,' but asking to be paid for his estimated time spent on the litigation at unjustified hourly rates." (alteration and quotation marks omitted)); *accord In re AMF Bowling*, 334 F. Supp. 2d 462, 470 (S.D.N.Y. 2004) ("Congress could have decided to allow class representatives to make fee applications based upon their time charges. But I find nothing in the statute to suggest that Congress intended to do so when it allowed class representatives to recover for their 'reasonable costs and expenses (including lost wages).' Indeed, I submit that the better reading is that Congress did not want lead plaintiffs to gain a benefit in any respect, except as a member of the class they represented.").

Plaintiff Azar argues that the 120 hours he spent working on the litigation represent "lost earning opportunities" and are thus compensable under the PSLRA as reasonable costs and expenses. Although the statute only mentions lost wages, some courts have included, in discussing what lead plaintiffs have *not* proven under the PSLRA, lost business opportunities or lost earning opportunities. *See, e.g.*, *In re Yahoo! Inc. Sec. Litig.*, 2018 WL 4283377, at \*3 (N.D. Cal. Sept. 7, 2018) ("In the instant case, the three named Plaintiffs do not claim that they lost wages, missed any work or other earning opportunities, or incurred any out-of-pocket expenses to participate in this litigation. They do not cite to lost sales commissions or any foregoing of employer-granted vacation time."); *Abrams v. Van Kampen Funds, Inc.*, 2006 WL 163023, at \*4 (N.D. Ill. Jan. 18, 2006) ("Lead plaintiffs do not contend that any portion of the requested amount represents any actual expenses that either has incurred. They do not claim that they missed any work or other earning opportunity in order to participate in the litigation."); *In re AMF*, 334 F. Supp. 2d at 470 ("Nothing presented . . . places the time devoted to this case by the

two [named plaintiffs] into the category of a recoverable expense. Neither claims any out-of-pocket expense. There is no assertion that either lost time at work or gave up employer-granted vacation time. Neither cites to lost sales commissions nor missed business opportunities.").

Assuming "lost business opportunities" are compensable as "reasonable expenses" under the PSLRA, they still must be adequately proven with meaningful evidence. Plaintiff Azar provides no information in his declaration regarding how many days per week on average he works as a background actor, let alone whether his work on this case precluded any acting work. No evidence shows what portion of the 120 hours spent working on the litigation reasonably might have been an "earning opportunity" that he lost. That Plaintiff Azar would have been available to work is not enough if the earning opportunity would not have been available. In his declaration, Plaintiff Azar provides no estimate of how many days he believes he could have worked as a background actor were it not for spending time on this case or how many of the 120 hours properly and reasonably should be considered lost earning opportunities. As a result, he is simply asking to be paid for his time spent on this case at the hourly rate he might have earned as a background actor, without showing that the hours were lost wages or lost work opportunities. This is insufficient, and Plaintiff Azar's request is denied. *See Schueneman*, 2019 WL 6700880, at *1 ("Schwartz's generalized statement that he would have spent the time he spent on this case 'on other work' fails to provide any basis for determining whether Schwartz . . . lost any wages or income as a result of the time spent on this case."); *In re Heritage Bond*, 2005 WL 1594403, at *17 ("These two plaintiffs' assertions that their 'performance of . . . duties as lead plaintiff has caused [them] to forgo business opportunities and has taken [them] away from [their] usual business' is insufficient to establish lost wages. The Court is only presented with the lead plaintiffs' self-serving declarations. There is no proof that a disinterested party would have paid

Sinow and Pilgeram at $200 per hour and $350 per hour respectively, the hourly rate they currently request the Court to accept. To the extent that Lead Plaintiffs request 'reasonable costs and expenses' under the PLSRA, no such award is shown to be appropriate.").[6]

### 4. Conclusion

The Court grants in part the motion for attorney's fees, expenses, and service awards, as discussed herein. Any appeal or any challenge affecting the Court's decisions regarding the attorney's fees, expenses, and service awards shall in no way disturb or affect the finality of the concurrently-filed Judgment.

## CONCLUSION

Plaintiffs' Unopposed Motion for Final Approval of: (i) Class Action Settlement; (ii) Class Certification; (iii) Plan of Allocation; and (iv) Application for Award of Attorney's Fees, Reimbursement of Expenses, and Service Awards (ECF 148) is GRANTED IN PART. The Court approves the Class Action Settlement and Plan of Allocation. Plaintiffs' counsel are awarded $764,750 in attorney's fees and $317,922.40 in expenses, to be paid from the Settlement Fund. Lead Plaintiffs' request for service or incentive awards is DENIED. This case is dismissed, but the Court retains jurisdiction over the parties and all matters relating to the Action

---

[6] The court in *In re Heritage Bond* denied the lead plaintiffs' requests for reasonable costs and expenses under the PSLRA, but granted the lead plaintiffs' requests, in a reduced amount, as incentive awards. 2005 WL 1594403, at *18. The opinion in that case was issued before the Ninth Circuit stated in *Rodriguez* (recently reiterated in the unpublished opinion in *Schwartz*) that the PSLRA does not allow incentive awards, and appears to have disregarded the statutory text limiting awards to lead plaintiffs.

and the Stipulation, including the administration, interpretation, construction, effectuation,

enforcement, and consummation of the Settlement and this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 31st day of December, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge